**BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., and its subsidiary, Medigroup of New Jersey, Inc. (d/b/a HMO Blue); Associated Hospital Service of Maine (d/b/a Blue Cross and Blue Shield of Maine), and its subsidiaries, Machigonne, Inc. (d/b/a Benefit Management of Maine) and Benefit Management, Inc.; BCBSD, Inc. (d/b/a**

**Blue Cross Blue Shield of Delaware); Blue Cross and Blue Shield of Florida, Inc., and its affiliates, Health Options, Inc. and Capital Group Health Services of Florida, Inc. (d/b/a Capital Health Plan); Bluecross Blueshield of Georgia, Inc., and its affiliate, HMO Georgia, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross Blue Shield of Michigan; Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company, and its affiliates, HMO of Mississippi, Inc., Employer Benefits Administrators, Inc., and Bluebonnet Life Insurance Company; Bluecross Blueshield of North Carolina; Blue Cross & Blue Shield of Rhode Island, and its subsidiary, Coordinated Health Partners, Inc.; Blue Cross and Blue Shield of South Carolina, and its subsidiaries, Companion HealthCare Corporation and Preferred Health Systems, Incorporated; Blue Cross and Blue Shield of Vermont; California Physicians' Service (d/b/a Blue Shield of California), and its affiliates, CareAmerica–Southern California, Inc., CPIC Life Insurance Company, and CareAmerica Life Insurance Company; Carefirst of Maryland, Inc.; Empire Blue Cross and Blue Shield; Group Hospitalization & Medical Services, Inc. (d/b/a Blue Cross Blue Shield of the National Capital Area); Louisiana Health Service & Indemnity Company, Inc. (d/b/a Blue Cross and Blue Shield of Louisiana); Mountain State Blue Cross & Blue Shield, Inc., and its subsidiary, Parker Benefits, Inc. (d/b/a Super Blue HMO); New Hampshire–Vermont Health Service (d/b/a Blue Cross Blue Shield of New Hampshire), and its subsidiaries, Matthew Thornton Health Plan, Inc., Matthew Thornton Insurance, Inc., and Health Initiatives, Inc.; New York Care Plus Insurance Company, Inc., (d/b/a Blue Cross and Blue Shield of Western New York, Blue Shield of Northeastern New**

---

York); Trigon Insurance Company (d/b/a Trigon Blue Cross Blue Shield), and its affiliates, Physicians Health Plan, Inc., HealthKeepers, Inc., Priority Health Care, Inc., Peninsula Health Care, Inc., Trigon Administrators, Inc., and Mid–South Insurance Company; and Excellus, Inc., and its subsidiaries, The Finger Lakes Companies, Inc. (and its subsidiaries, Finger Lakes Health Insurance Company, Inc. and Finger Lakes Medical Insurance Company, Inc.), Excellus of Central New York, Inc. (and its subsidiary Excellus Health Plan, Inc.), and Upstate Holding Company, Inc. (and its subsidiary, Utica–Watertown Health Insurance Co., Inc.), Plaintiffs,

v.

PHILIP MORRIS, INCORPORATED; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T. Industries P.L.C.; British American Tobacco Company, Ltd.; Lorillard Tobacco Company; Liggett Group, Inc.; Liggett & Myers Inc.; United States Tobacco Company; The Tobacco Institute, Inc.; The Council For Tobacco Research—U.S.A., Inc.; The Smokeless Tobacco Council, Inc.; Hill and Knowlton, Inc.; and Unknown Corporations A–Z, Defendants.

No. 98 CV 3287.

United States District Court,
E.D. New York.

March 30, 1999.

Dewey Ballantine LLP, New York, N.Y. by Paul J. Bschorr, Vincent R. Fitzpatrick, Jr. Michael C. Hefter, Heather K. McDevitt, for Plaintiffs.

Wachtell, Lipton, Rosen & Katz, New York, N.Y. by Steven M. Barna, Michael A. Charish, and Swidler Berlin Shereff Friedman, LLP, New York, N.Y. by Joseph F. Donley, for Defendant Philip Morris, Incorporated.

**564**

Sedgwick, Detert, Moran & Arnold, New York, N.Y. by David M. Covey, for Defendants Brown & Williamson Tobacco Corporation.

Greenberg Traurig, New York, N.Y. by Alan Mansfield, and Shook, Hardy & Bacon, L.L.P., Kansas City, MO by Shannon L. Spangler, Lisa A. Lukaszewski, for Defendants Lorillard Tobacco Company, Lorillard, Inc., and Loews Corp.

Debevoise & Plimpton, New York, N.Y. by Sean Morris, for Defendant Council for Tobacco Research, U.S.A., Inc.

Skadden, Arps, Slate, Meagher & Flom LLP, New York, N.Y. by Arthur Aizley, for Defendant United States Tobacco Company.

Jacob, Medinger & Finnegan, LLP, New York, N.Y. by David R. Crittenden, for Defendant Smokeless Tobacco Council, Inc.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA by Peter J. Busch, for Defendants R.J. Reynolds Tobacco Co., and RJR Nabisco, Inc.

Simpson Thacher & Bartlett by Steven R. Rosenblatt, for Defendant British American Tobacco (investments) limited (formerly known as British–American Tobacco Company Limited).

## MEMORANDUM AND ORDER

WEINSTEIN, Senior District Judge.

I. INTRODUCTION ............................................... 564
II. COMPLAINT .................................................. 565
   A. RICO ..................................................... 565
   B. FEDERAL ANTITRUST ................................. 566
   C. STATE LAW CLAIMS ................................... 566
III. FACTS AND LAW ........................................... 566
   A. RICO ..................................................... 566
      1. Racketeering Enterprise Affecting Interstate Commerce ............... 566
      2. Standing ............................................ 568
        a. Injury to Business or Property ................... 569
          (1) Plaintiffs' Business and Property Losses ................ 569
          (2) "Pass–Through" ................................. 569
          (3) Purely Economic vs. Personal Injury Claims ............. 570
        b. Proximate Cause ............................... 573
          (1) Holmes Standard .............................. 573
            (a) Ascertainable damages ..................... 575
            (b) Apportioning Damages ..................... 576
            (c) Sufficient deterrence ...................... 576
          (2) Second Circuit Cases ......................... 577
          (3) "Rule" of Remoteness ........................ 579
      3. Subrogation ........................................ 585
   B. ANTITRUST ............................................. 588
   C. STATE LAW ............................................. 588
   D. INDISPENSABLE PARTIES AND PLEADING FRAUD ............. 588
IV. CONCLUSION ................................................ 589

## I. INTRODUCTION

There is now presented another battle in the modern tobacco litigation war. The case pits major portions of the health care industry against the leading cigarette manufacturers.

This memorandum deals primarily with defendants' motion to dismiss on the pleadings. The motion is denied.

Because of its complexity, the litigation will be limited and closely supervised by the court pursuant to Rule 16 and by analogy to Rule 23. Subject to motions and a full opportunity to be heard, the case is scheduled for trial in January of 2000 solely on the theory that defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO). In view of the sums sought, and the treble recoveries and legal fees and costs recoverable by a successful plaintiff in a RICO suit, the stakes are substantial.

This suit is one of three nationwide brought by Blue Cross and Blue Shield medi-

cal providers ("The Blues") for the recovery of economic damages they incurred in the medical treatment of diseases caused by tobacco use. Before this court are Blues organizations from nineteen states and the District of Columbia. They allege violations of the federal RICO and the Clayton and Sherman Antitrust Acts. Pendent state law claims are also asserted under various statutes and under the common law on theories of fraudulent misrepresentation, fraudulent concealment, breach of special duty, unjust enrichment, and conspiracy.

Defendants are the major tobacco manufacturers and related entities. They have moved on the pleadings to dismiss various claims in the complaint for failure to state a claim (Fed.R.Civ. P. 12(b)(6)), failure to join an indispensable party (Fed.R.Civ. P.12(b)(7),19), and failure to plead fraud with particularity (Fed.R.Civ.P.9).

For purposes of this motion the propositions of fact in plaintiffs' pleadings must be assumed to be true. Nevertheless, in view of what medical professionals have long known about the addictive and deleterious effects of tobacco, some skepticism about the accuracy of the allegations is in order. Resolution on the facts can only take place after discovery, which will be expedited by the magistrate judge.

## II. COMPLAINT

### A. RICO

The first two counts in the complaint purport to state a cause of action under the federal RICO statute. Count one alleges that ten of the defendants conducted and conspired to conduct a pattern of racketeering activity through enterprises engaged in interstate commerce. See 18 U.S.C. §§ 1962(c) and 1962(d).

Count two alleges that all of the defendants invested and conspired to invest racketeering proceeds in the acquisition, establishment, and operation of enterprises engaged in interstate commerce. See 18 U.S.C. §§ 1962(a) and 1962(d).

According to the complaint, the defendants' pattern of racketeering dates back to 1953. Specifically, the plaintiffs trace incep-tion to a meeting on December 15, 1953 at the Plaza Hotel in New York City. There R.J. Reynolds, Philip Morris, Lorillard, Brown & Williamson, U.S. Tobacco, Hill and Knowlton and others conspired to conduct a campaign of misinformation to deceive the American public concerning the health consequences and addictive qualities of smoking and tobacco use.

To accomplish this program of misinformation, it is alleged, the defendants established, funded, and directed three entities—The Council for Tobacco Research, the Tobacco Institute, and the Smokeless Tobacco Research Council, Inc. Through them the defendants allegedly conducted a pattern of racketeering which induced the American public, national, state and local governments, and vital segments of the country's health care system, including the plaintiffs, to underestimate the dangers of tobacco use and as a result to suffer vast financial harm.

The defendants conducted their misinformation campaign, it is alleged, through a pattern of racketeering, including acts of mail and wire fraud (18 U.S.C. §§ 1341, 1343), threatening and intimidating witnesses (18 U.S.C. §§ 1512, 1513), and interstate and foreign travel in aid of racketeering (18 U.S.C. § 1952).

By far the most extensive allegations of racketeering involve mail and wire fraud. The plaintiffs summarize these allegations as follows:

> Those schemes have involved suppression of information regarding the health consequences associated with smoking, as well as fraudulent misrepresentations and omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. Defendants' misrepresentations and fraudulent concealment of material facts, directly or by implication, include but are not limited to the following: misrepresentations and fraudulent concealment of the addictive nature of nicotine and the adverse health consequences of tobacco products; misrepresentations that such health effects of addictiveness were unknown or unproven; misrepresentations about Defendants' ability to manipulate and about

the manipulation of nicotine levels and the addictive qualities of cigarettes; misrepresentations that they would provide the public and governmental authorities with objective, scientific information regarding all phases of smoking and health; and fraudulent concealment of certain aspects of smoking and health, including the availability of safer cigarettes and less addictive cigarettes.

The result of this fraud upon the American public, the plaintiffs allege, has been enormous profits for the defendants and huge losses to the plaintiffs. According to the second count of the complaint, the defendants have utilized these racketeering profits to acquire interests in and establish or operate their own businesses and other enterprises.

## B. FEDERAL ANTITRUST

Counts three and four of the complaint allege violations of federal antitrust law. Plaintiffs contend that the defendants have conspired to restrain trade by eliminating competition in the market for "less harmful" tobacco products. According to the complaint:

> Defendants have conspired: (1) to suppress innovation and competition in product quality by agreeing not to engage in research, development, manufacture and marketing of less harmful cigarettes and other nicotine products; (2) to suppress output in a market, and to engage in concerted refusal to deal, by agreeing to keep at zero the output of less harmful cigarettes and other nicotine products; and (3) to suppress competition in marketing by agreeing not to take business from one another by making claims as to the relative safety of particular brands, whether or not such claims would have been truthful.

As a direct result of this conspiracy, the plaintiffs allege, the public has been deprived of less harmful tobacco products; availability would have greatly reduced the health care costs associated with smoking. Plaintiffs allege that these actions by the defendants violated section one of the Sherman Act and the Clayton Antitrust Act and gave them

standing to sue under those acts. 15 U.S.C. §§ 1, 15.

## C. STATE LAW CLAIMS

State law based claims are also included. In counts five through nine plaintiffs allege common law actions of fraudulent misrepresentation, fraudulent concealment, breach of special duty, unjust enrichment, and conspiracy. In counts ten through fifty three, individual plaintiffs allege violations of state statutory law. Typical among these claims are allegations of unfair competition, false advertising, restraint of trade, consumer fraud, false advertising, and state antitrust and RICO.

## III. FACTS AND LAW

### A. RICO

According to the complaint the plaintiffs have sustained substantial economic injury as a result of the defendants' campaign of deceit concerning the addictive characteristics and health hazards of tobacco products. They allege that the fraudulent conduct amounts to a violation of RICO. 18 U.S.C. 1962(a), (c) and (d).

#### 1. Racketeering Enterprise Affecting Interstate Commerce

■ Section 1962(c) makes it illegal to conduct the affairs of an "enterprise" through a pattern of racketeering. It provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .

The defendants in this case allegedly conducted a decades-long scheme to deceive the American public concerning the health hazards and addictive characteristics of their tobacco products. In conducting this campaign of fraud the defendants made extensive use of mail and wire services. Such actions qualify as "racketeering" as defined in the statute. The statute reads:

"racketeering activity" means ... (B) any act which is indictable under any of the following provisions of title 18, United State Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ... section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant).. . .

18 U.S.C. § 1961(1).

Section 1961(4) broadly defines "enterprise" as including:

> any individual, partnership, corporation, association, or other legal entity ... or group of individuals associated in fact although not a legal entity.

18 U.S.C. § 1961(4).

■ Two different types of enterprise are alleged. First, plaintiffs claim that the Tobacco Institute, the Council for Tobacco Research, and the Smokeless Tobacco Research Council, Inc. each individually constitute an enterprise. Each of these organizations are New York non-profit corporations. Since enterprises for RICO purposes include "every kind of legal entity," these non-profit corporations satisfy the § 1961(4) definition. *See United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989).

■ Second, plaintiffs allege that all three organizations collectively constitute an enterprise (the "Public Relations Enterprise"). Since the "Public Relations Enterprise" is not alleged to be a legal entity in itself, the question is whether it is an "association in fact" that would constitute an enterprise for purposes of RICO. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) (association in fact enterprise is entity or group of persons "associated together for a common purpose of engaging in a course of conduct"). An "association in fact" enterprise must have an ongoing organization, formal or informal, and must function as a continuing unit. *Id.*

■ Distinct entities can jointly function as an enterprise for RICO purposes when they are "connected by a defendant's participation in them through a pattern of racketeering activity." *United States v. Stolfi,* 889

F.2d 378, 380 (2d Cir.1989); *see also United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir.1991) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it *does,* rather than by abstract analysis of its structure.' " (quoting *United States v. Bagaric,* 706 F.2d 42, 56 (2d Cir.1983))).

Plaintiffs have more than adequately alleged the on-going nature, structure, and unity of purpose required by *Turkette* in their description of the "Public Relations Enterprise." *See, e.g.,* Compl. ¶ 106 (quoting 1953 memorandum of defendants stating, "the [defendants] do not favor the incorporation of a formal association.... Instead, they prefer strongly the organization of an informal committee which will be specifically charged with the public relations function").

The enterprises described in the complaint would have a substantial effect on interstate commerce. See 18 U.S.C. § 1962(a).

A RICO violation requires proof of a "pattern of racketeering activity," through "at least two acts of racketeering activity ... the last of which occurred within ten years." 18 U.S.C. § 1961(5). Many such acts up to the present are alleged.

The Act also makes it illegal to receive income from or invest the proceeds of a racketeering activity. Section 1962(a) provides:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

If true, the allegations in the second count of the complaint demonstrate that the defendants have reaped profits from the charged racketeering conduct and have channeled these profits into a number of "enterprises" affecting commerce.

Section 1962(d) of title 18 makes it unlawful for anyone to conspire to violate subsec-

tions (a) or (c) of section 1962. The allegations support the charge that the defendants have conspired to racketeer.

There is no deficiency in the first two counts of the complaint with respect to the relevant provisions of the RICO statute.

## 2. Standing

Civil remedies for RICO violations are provided by section 1964 of title 18. The crux of the defendants' motion to dismiss the RICO claims lies in their challenge to the standing of plaintiffs to bring this civil suit. RICO grants standing to those injured in their "business or property" as a result of racketeering. It provides:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

The expansive terms of 1964(c) are designed to afford broad standing to RICO plaintiffs. By providing a cause of action to "any person injured" by reason of the law's violation, the statute avoids undue limitations on the classes of plaintiffs eligible to enforce the Act. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[W]e perceive no distinct 'racketeering injury' requirement.... If the defendant engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)."); *cf. Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (the analogous "any person" provision of the Clayton Act means that, "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 472, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("Consistent with the congressional purpose, we have refused to engraft artificial limitations on the [standing provision of the Clayton Act].").

Affording broad standing to RICO plaintiffs is consistent with the statute's purpose. It was passed in order to address what was found to be a pervasive and serious problem in our society, namely the proliferation of racketeering within the legitimate business sector.

The criminal penalties for violations of RICO are stiff. Yet civil provisions of RICO recognize that criminal prosecutions alone are inadequate to deal with racketeering. The government is not in a position to identify all significant transgressions. Providing members of the public with a civil cause of action against racketeers allows private parties to effectuate the law's policies and increases the likelihood that instances of racketeering will be punished. Treble damage and other provisions enhance the likelihood that private parties will be induced to assume the role of "private attorneys general," vindicating not only their own interests, but those of society as well. *See, e.g., Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("Both statutes [RICO and Clayton] bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages.").

■ The broad scope of the statute's standing provision is not, however, boundless. Only those plaintiffs who have been injured in their "business or property" may sue. Personal injuries are not cognizable, regardless of whether they were caused by racketeering. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 509, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (Marshall, J., dissenting) (RICO's exclusion of personal injury claims); *cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (phrase "business or property" in Clayton Act excludes personal injuries). The exclusion of personal injury claims is consistent with the statute's primary aim of protecting

legitimate businesses from the influences of racketeering.

A second limitation exists by virtue of the phrase, "injured ... by reason of a violation of section 1962." "By reason of" has been interpreted by courts to require something more than "but for" causation.

■ In the leading case, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court interpreted RICO's "injured ... by reason of" language to require a showing of "proximate causation." *See also Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990) ("[T]he RICO pattern or acts must *proximately* cause plaintiff's injury.").

### a. Injury to Business or Property

**(1) Plaintiffs' Business and Property Losses**

■ Plaintiffs have alleged substantial injuries to their business and property. According to the complaint, the defendants' racketeering has caused the plaintiffs to expend billions of dollars in otherwise avoidable medical expenditures.

■ Such economic losses would constitute an injury to both the plaintiffs' business and property. Money constitutes "property" within the meaning of RICO. Construing the analogous wording of the standing provision of the Clayton Act, the Supreme Court found in *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), that a consumer stated a valid cause of action under federal antitrust law when she paid higher prices for products than she otherwise would have were it not for the price-fixing schemes of the defendants. *See id.* at 339, 99 S.Ct. 2326 ("When a commercial enterprise suffers a loss of money it suffers an injury in both its 'business' and its 'property.' "); *see also Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 103 (2d Cir.1990) ("[C]ases interpreting the meaning of 'business or property' in the Clayton Act context have applicability in the RICO area, as well.").

Plaintiffs also have standing to sue under RICO by virtue of the injury they have sustained to their business. *See id.; Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir.1994) ("[C]ivil remedy provided in § 1964(c) disjunctively entitles '[a]ny person injured in his business or property by reason of a [RICO] violation ...' to recover treble damages." (brackets in original)).

The interpretation of the term "business" in the RICO statute has received sparse attention from the courts. This may be because the Supreme Court's expansive definition of the term "property" in this context has greatly reduced the need for plaintiffs to allege, or for the courts to address, a claim of injury to business. In the antitrust context, the Supreme Court has interpreted the term to refer to "commercial interests or enterprises." *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

Although they are "non-profit" entities, the plaintiffs are in the "business" of providing health care. As a result of the defendants' alleged racketeering, the plaintiffs have allegedly been forced to expend over a billion dollars on medical procedures. But for the defendants' conduct, this money could have been utilized by the plaintiffs to advance or further their other business interests. This massive misallocation of financial and human resources has severely undermined, it is alleged, the plaintiffs' ability to provide a higher quality of health care to its insureds at less cost. Allegations in the complaint are sufficient to state an injury to the plaintiffs' business and property under RICO.

**(2) "Pass–Through"**

■ Defendants' position is that plaintiffs have already "passed through" any possible losses by way of higher premiums, obviating any injury to themselves. The fact that some of the costs of tobacco use may have been "passed on" in the form of higher premiums does not negate plaintiffs' RICO damages.

■ Virtually all wrongs committed against businesses, including antitrust, securities, and RICO violations, are ultimately passed on to consumers in the form of higher costs or reduced services or both. Under American law, nevertheless, the right to bring a RICO or antitrust action devolves to

the injured business which initially sustained the economic damages. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir.1995).

The law looks to the injured business because it is often the only party with sufficient resources and incentives to successfully vindicate society's interests and deter future violations. Class actions by consumers are often unwieldy, complicated, speculative, and less efficient than direct actions by the injured business. *See, e.g., Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir.1995) ("It would be cumbersome, to say the least, for patients … to organize into a class action to recover money that the patients never paid and that if they received in a judgment or settlement they would have to share with Blue Cross….").

The general class of consumers to whom the costs were passed on by the Blues will, in any event, be the likely ultimate beneficiaries of any recovery in the form of future reduced premiums or increased services, or both. Where the plaintiffs are regulated, non-profit entities, as in the case of the Blues, there is a high degree of assurance that recoveries will be "passed back" to benefit the consumers. *Cf.* Sylvia A. Law & Barry Ensminger, *Negotiating Physicians' Fees*, 61 N.Y.U. L.Rev. 1, 7–8 n. 31 (1986) (In 1984 Blues paid 90 cents in claims of each dollar they collected in premiums while commercial insurers paid only 76.3 cents of each dollar); *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis.2d 437, 360 N.W.2d 33, 42 (1985) ("Nowhere is the need for cost control more pressing than in the field of hospitalization and medical insurance. Where a hospitalization or medical insurance policy clearly promises to indemnify the insured only for out-of-pocket losses, then the equitable subrogation doctrine serves to make the health care payment system more efficient.").

Higher premiums is one, but only one, of the social costs attributable to the defendants' misconduct. The defendants' racketeering has allegedly resulted in decades of misallocation of resources within the health care industry. Medical assets devoted to the treatment and care of smoking related diseases would have otherwise been spent, for example, on the development of new procedures and methods of treatment for other diseases and illnesses. Plaintiffs are in the best position to rectify the broad social costs of defendants' racketeering by such methods as utilizing the proceeds of any recovery to encourage and facilitate the expansion of medical research and treatment or to reduce premiums.

### (3) Purely Economic vs. Personal Injury Claims

■ Allegations in the complaint support the conclusion that plaintiffs have standing under RICO because they have sustained economic injuries to their business and property separate and distinct from the personal injuries suffered by the smokers or second hand smoke victims.

■ Economic injury is recoverable under RICO even when the racketeering causing the injury also results in personal injuries to third parties. A contrary result would invite racketeers to evade RICO constrictions by adding personal injuries to their litany of misdeeds. *See, e.g., Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918–19 (3d Cir.1991) (plaintiff allowed to recover for property damages to house caused by toxic waste, but not for personal injuries); *Snead v. Hygrade Food Products Associates*, 1998 WL 910223, at *3 (E.D.Pa.1998) (emotional distress claims dismissed, claims for economic damages resulting from loss of employment allowed); *Reynolds v. Condon*, 908 F.Supp. 1494, 1517–19 (N.D.Iowa 1995) (emotional distress caused by RICO extortion not allowed but claims for loss of home and loss of income approved); *In re Cordis Corp. Pacemaker Product Liability Litigation*, 1992 WL 754061, at *3 (S.D.Ohio 1992) (plaintiffs allowed to allege RICO claims for costs of defective pacemakers and for costs of implanting and explanting them, but not for personal injuries).

The plaintiffs' injuries are purely economic. They are distinguishable from any personal injuries caused by the defendants' racketeering.

Nevertheless, defendants argue that the plaintiffs' RICO claims should be barred because they are in some sense "derivative" of the personal injuries sustained by third parties. Courts in this circuit have favored pecuniary claims related to personal injuries. *See Jerry Kubecka, Inc. v. Avellino,* 898 F.Supp. 963, 968 (E.D.N.Y.1995) ("If [murder victims] had been merely disabled by the attempt on their lives but survived, presumably they would have had a RICO claim for lost earnings from their business activities because they had been injured in their 'business or property.'"); *von Bulow v. von Bulow,* 634 F.Supp. 1284, 1309 (S.D.N.Y.1986) ("The cost to [murder target] of her committee and her inability to enjoy her personal and real property may well be compensable monetary injuries under RICO."). Other circuits have not allowed a party who has suffered a personal injury to bring a RICO claim for the pecuniary losses associated with the personal injuries. *See Doe v. Roe,* 958 F.2d 763, 770 (7th Cir.1992) (no RICO claim for client coerced by lawyer into sexual relations; "sexual labor" not property for RICO purposes and related pecuniary expenditures "reflect personal injuries which are not compensable under RICO"); *Grogan v. Platt,* 835 F.2d 844, 848 (11th Cir.1988) (no RICO claim for pecuniary losses of injured FBI agents and estates of murdered agents; losses "most properly understood as part of a personal injury claim"); *Drake v. B.F. Goodrich Co.,* 782 F.2d 638, 643–44 (6th Cir.1986) (wrongful death claimants not allowed to amend complaint to state RICO action).

Even if this court were to adopt the reasoning employed in other circuits, as defendants urge, it nevertheless remains true that the Blues have stated a RICO injury to their "business or property." In all the cases where pecuniary damages were not allowed, the gravamen of the plaintiffs' claims was for personal injuries. The plaintiffs' economic losses were interfused with and merely supplemental to their personal injuries. Conceptually, as well as practically, the two types

of claims were joined together as a single cause of action. *See Grogan,* 835 F.2d at 846 ("[T]he pecuniary and non-pecuniary aspects of personal injury claims are not so separated as the appellants would have us accept; rather, loss of earnings, loss of consortium, loss of guidance, mental anguish, and pain and suffering are often to be found, intertwined, in the same claim for relief.").

In the instant suit, by contrast, the plaintiffs have suffered entirely economic injuries. Any personal injuries to smokers and to persons exposed to cigarette smoke caused by the defendants' alleged racketeering are separate and distinct from the plaintiffs' economic injuries suffered by their businesses. *See, e.g., Steele v. Hospital Corp. of America,* 36 F.3d 69, 70 (9th Cir.1994) (rejecting RICO claim of patients for overbilling of hospital because, "if the patients have paid none of the allegedly excessive charges out of their own pockets because those charges were covered by insurance, then they have suffered no financial loss"). The Blues have a right to bring their own legal claim for their own injuries.

■ The law of equity has long recognized that plaintiffs such as the Blues have a right to recoup the economic losses they themselves incur as a result of tortious injury to their insureds. In almost all jurisdictions, plaintiffs such as the Blues, as the real parties in interest, may bring legal actions to enforce this right under their own names. *See, e.g., United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 379, 70 S.Ct. 207, 94 L.Ed. 171 (1949) ("[B]oth the insured and insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest."); *Virginia Elec. & Power Co. v. Westinghouse Elec. Corp.,* 485 F.2d 78, 84 (4th Cir.1973) ("Either party may bring the suit—the insurer-subrogee to the extent it has reimbursed the subrogor, or the subrogor for either the entire loss or only its unreimbursed loss."); 6A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1546, at 360 (2d ed.1990) ("Either the insured or the insurer may sue."). The general rule in federal courts is that the insured is not an indispensable party under Rule 19 and need not be

joined in the insurer's action against the tortfeasor if the joinder would deprive the court of subject matter jurisdiction. *See, e.g., Aetna*, 338 U.S. at 382 n. 19, 70 S.Ct. 207 (insureds and insurers "clearly not 'indispensable' parties"); *Krueger v. Cartwright*, 996 F.2d 928, 934 (7th Cir.1993) ("We agree with the majority of courts that have addressed the issue and applied this principle [that neither is indispensable] as a general rule in cases of partial subrogation.").

In most jurisdictions the insureds themselves have no equitable claim to compensatory damages predicated upon payments made directly by the Blues. In some jurisdictions, such as New York, smokers are even statutorily barred from recovering for those medical expenses paid by Blue Cross. N.Y. C.P.L.R. § 4545(c) (McKinney 1992).

While the states have taken a wide variety of approaches to the law of subrogation, a current view is that the insurer's claims for economic damages are separate and distinct from those of the insureds. *See, e.g., Arkwright–Boston Manufacturers Mutual Ins. Co. v. City of New York*, 762 F.2d 205, 209 (2d Cir.1985) ("These two claims [of subrogor and subrogee] are separate and distinct, and do not constitute unlawful splitting under New York law."); *Fidelity & Deposit Co. of Maryland v. Gaspard*, 1997 WL 335598, at *2 (E.D.La.1997) ("Since the two claims [of subrogee and subrogor] against [defendant] are distinct, a judgement rendered in the absence of [subrogor] would have no prejudicial affect on him."); *Winkelmann v. Excelsior Ins. Co.*, 85 N.Y.2d 577, 582, 626 N.Y.S.2d 994, 650 N.E.2d 841 (1995) ("The claims of the insurer for amounts paid by it and the insured's claim for uninsured losses are divisible and independent, and '[p]ermitting the insurer to sue ... as equitable subrogee does not affect the insured's right to sue for the amount of the loss remaining unreimbursed.' " (quoting *Federal Ins. Co. v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 374, 553 N.Y.S.2d 291, 552 N.E.2d 870 (1990))). The Blues' economic losses are "derived" in some sense from the injuries of others but the Blues' economic injuries are nonetheless separate and distinct from the injuries sustained by others and the Blues' legal claims are properly understood as separate and independent from the claims of others.

An analysis of the purpose of the RICO statute confirms the conclusion that the statute may be applied to remedy the plaintiffs' economic injuries in the instant suit. When Congress drafted the "business and property" provision in the statute, it may be assumed to have known that sufficient remedial measures already existed for those suffering personal injuries at the hands of racketeers. *See, e.g., Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918 (3d Cir.1991) ("Congress' apparent unwillingness to allow recovery for personal injuries under RICO appears to be consistent with enacting RICO and its specific intention to thwart the organized criminal invasion and acquisition of legitimate business enterprises and property. Ample law already existed to provide recovery for wrongfully inflicted personal injuries.").

The deleterious influence of racketeers upon legitimate businesses presented a well known, pressing and unresolved problem for society. RICO was specifically designed to address and curtail these adverse economic consequences. The legislative findings which preface the statute include the following:

> Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of ... fraud....

Pub.L. No. 91–452, § 1, 84 Stat. 922, 922 (1970).

The Senate Committee Report concluded that racketeers constituted a "serious threat to the economic well-being of the Nation." S.Rep. No. 91–617, at 79 (1969). One of the primary aims of RICO was to "seek the eradication of organized crime in the United States ... by providing enhanced sanctions and new remedies." Pub.L. No. 91–452, § 1, 84 Stat. 922, 923 (1970). Treble damages were viewed as an important feature of the statute because, in the words of one Senator, they protect "the honest businessman who has been damaged by unfair competition from the racketeer businessman." 115 Cong. Rec. 6993 (1969) (statement of Sen. Hruska).

Application of RICO to the facts alleged in the complaint is entirely consonant with the statute's stated aims and purpose. The alleged injury to the Blues' business and property has undermined the financial health and stability of a critical industry in this nation's economy. This country is currently said to be facing a crisis of health care finance. *See, e.g.,* Vernellia R. Randall, *Managed Care, Utilization Review, and Financial Risk Shifting,* 17 U. Puget Sound L.Rev. 1, 3 (1994) ("[T]he costs of health care delivery has increased and has become a national concern."); Peter T. Kilborn, *Experts Offer Information About Americans Without Health Insurance,* N.Y. Times, Feb. 26, 1999, at A1 (43.4 million Americans without insurance "adding to the burdens on the nation's health care system"). If the allegations are true, the well orchestrated racketeering on the part of the defendants has played a major role in precipitating this crisis and inflating this nation's health care costs to their current levels. The Blues provide medical care and coverage to almost 70 million Americans.

Just as the legislative history of RICO forewarned, the defendants' racketeering has allegedly "drained billions from the American economy." It is difficult to imagine a sector in the economy, a portion of the nation's resources, or an aspect of its economic life, which has not been severely affected by the defendants' alleged racketeering. For example, the nation's employers have found it increasingly expensive and difficult to fund health care coverage for their own employees. See Jennifer Steinhauer, *Health Insurance Costs Rise, Hitting Small Business Hard,* N.Y. Times, Jan. 19, 1999, at A1. In order to stay competitive, businesses have been forced to devote larger and larger portions of their resources to providing health care or have reduced benefits to their workers, forcing taxpayers, the Blues, and premium payers to subsidize the medical treatment of those who can no longer afford insurance. Research or treatment which would have been supported by resources of the health care industry have, it is contended, been neglected as a result of the defendants' alleged pattern of racketeering.

In sum, the allegations in the complaint describe precisely the type of far-reaching, economic dislocation which RICO was intended to combat. The Blues represent the kind of business which RICO is designed to protect from racketeering. It may be reasonable to conclude that Congress assumed plaintiffs with personal injury claims would avail themselves of existing remedies under state law. It is not reasonable to believe that the systemic, economic injuries allegedly sustained by the plaintiffs in the instant case were beyond the designed scope of RICO when Congress explicitly provided that "any person injured in his business or property" shall have a cause of action under the statute.

■ Any doubts concerning the applicability of the statute should be resolved in favor of the vigorous enforcement of RICO's remedies. Congress specifically instructed the courts to interpret the statute broadly. It provides, "[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub.L. No. 91–452, § 904(a), 84 Stat. 922, 947 (1970). In *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court firmly rejected the attempt by the court of appeals for the Second Circuit to narrow the reach of RICO's civil provisions, pointing out, "RICO is to be read broadly.... This is the lesson not only of Congress' self-consciously expansive language and overall approach but also of its express admonition ...." (citation omitted). Enforcement of RICO to compensate for economic and business injuries such as those claimed by plaintiffs is entirely consistent with the statute's meaning and purpose.

b. Proximate Cause

(1) Holmes Standard

Defendants protest that the requirements of proximate causation have not been satisfied in the complaint. In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court did rule that a proximate causation requirement was incorporated into the "by reason of" language in RICO's standing provision.

The plaintiff in *Holmes* was the Securities Investor Protection Corporation (SIPC). SIPC is a non-profit corporation established by Congress to protect consumers when broker-dealers cannot meet their financial obligations. In *Holmes,* SIPC alleged that it had become obligated to reimburse customers of two failing broker-dealers as a result of a racketeering scheme to manipulate stock prices.

The Supreme Court held that SIPC had no standing to bring a RICO action against the stock manipulators because its injuries were not "proximately caused" by the racketeering. Borrowing from the standing provision of the Clayton Act, which had served as a model for RICO, the Supreme Court held that proximate cause was a requirement for RICO standing by virtue of the "by reason" of language of § 1964(c):

> Before 1914, lower federal courts had read § 7 [of the Sherman Act] to incorporate common-law principles of proximate causation. . . . Thus, we held that a plaintiff's right to sue under § 4 [of the Clayton Act] required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well.
>
> The reasoning applies just as readily to § 1964(c). . . . Proximate cause is thus required [for RICO].

*Holmes,* 503 U.S. at 267–68, 112 S.Ct. 1311 (citations omitted).

Proximate cause, the Supreme Court suggested, is one of those "judicial tools" that courts employ to limit a party's responsibility for the consequences of its acts. *Id.* at 268, 112 S.Ct. 1311. "At bottom," the Court continued, "the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Id.* (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed.1984)).

In *Holmes* the Court found that the connection between the plaintiff's injuries and the defendants' racketeering was insufficient to warrant a finding of proximate cause. The link between the defendants' conduct and the plaintiff's injuries was insufficient, the Court ruled, because it depended entirely upon the "intervening insolvency" of a third party, i.e. the broker-dealers. *Holmes,* 503 U.S. at 271, 112 S.Ct. 1311 ("The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors.").

■ The Court reasoned that there were three principal difficulties with finding proximate cause in *Holmes.* First, it would be difficult, theoretically and practically, to ascertain the amount of the plaintiff's damages which were attributable to the defendants' conduct, as opposed to those damages which may have been caused by other, non-racketeering factors—such as the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets. *Id.* at 273, 112 S.Ct. 1311. Second, it would be theoretically and administratively difficult to apportion the respective recoveries between the different potential plaintiffs, for example, SIPC, the broker-dealers, and the ultimate consumers. *Id.* Finally, there was insufficient justification for any court to attempt to resolve these difficulties in light of the presence of a suitable plaintiff, the broker-dealers, who had sufficient incentive and resources to "bring suit for the law's vindication." *Id.*

The Court reasoned that these three concerns underlie proximate causation analysis in this context. *Id.,* 503 U.S. at 269, 112 S.Ct. 1311. By contrast, employing the reasoning and analysis in *Holmes* supports the conclusion that the Blues' injuries were proximately caused by the defendants' alleged pattern of racketeering.

The Blues' injuries are readily distinguishable from those at issue in *Holmes.* Unlike *Holmes,* for example, the Blues allege that their injuries were specifically intended by the defendants. Defendants have allegedly derived substantial, direct benefits from the plaintiffs' injuries. The extensive medical care provided by the plaintiffs has, in effect, subsidized the defendants' racketeering activity. Absent the Blues' medical care, the defendants would not have been able to derive substantial profits from their trade. For

this reason, the plaintiffs contend, they have been as much the target of the defendants' racketeering as have the smokers themselves.

Unlike *Holmes*, furthermore, the Blues have alleged specific reliance upon the defendants' acts of mail and wire fraud. Had the plaintiffs not been deceived by the stream of misinformation beginning in 1953, they say they would have been able to reduce the health related costs associated with tobacco use among their insured pool. Medical insurer-providers such as the Blues currently operate wellness and educational programs to encourage their clients to cease or avoid smoking; they would have begun similar programs at a much earlier date had the truth about tobacco products not been concealed by the defendants. These tobacco related costs that plaintiffs have incurred are, it is contended, the direct result of the defendants' racketeering.

■■■ Plaintiffs' RICO standing is entirely consistent with the three fundamental concerns of proximate cause addressed by the Court in *Holmes*. In *Holmes*, the Court determined that all three factors—multiple causation, apportionment, and proper plaintiff—militated against a finding of proximate cause. In the instant case, by contrast, an analysis of all three factors supports the plaintiffs' argument that their injuries were proximately caused by the defendants' pattern of racketeering.

### (a) Ascertainable damages

With respect to the first *Holmes* factor, the Court observed that "indirect" claims often present intractable difficulties in distinguishing between those damages which were caused by the defendants' conduct from those which were caused by other factors. In the context of *Holmes*, the Court pointed out that there were several factors which could have contributed to the plaintiff's injuries which had no relationship to the defendants' conduct. It is not unusual for a broker-dealer to encounter financial problems or to face difficulties in satisfying all its creditor obligations. Occasionally it is possible to trace these adversities to poor financial management on the part of dealer-broker, a lack

of business acumen, a misreading of the market, or just plain bad luck. In *Holmes*, it was impossible to determine whether any of these such factors contributed, and if so by how much, to the financial failings of the dealer-brokers involved.

By contrast, the Blues are likely to have extensive documentation with respect to the medical care they have provided to their insureds. Plaintiffs may well be able to establish, by means of experts and scientific and statistically based evidence, what proportion of the medical care was provided to treat the effects of tobacco use. The aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of the possible error. *See, e.g., Allen v. United States*, 588 F.Supp. 247, 417 (D.Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir.1987) ("In a large population, random variations tend to cancel each other out, yielding an overall observed distribution that is far more useful in evaluating correlations, relationships and probabilities."); *The Evolving Role of Statistical Assessments as Evidence in the Courts* 189 (Report of the Panel on Statistical Assessments as Evidence in the Courts, Stephen E. Fienberg ed., 1989) ("Many cases brought against the manufacturers of Bendectin, DES, superabsorbent tampons, and the Dalkon Shield are still before the courts, but critical to those decisions already reached (both positive and negative) have been epidemiological and statistical studies that attempt to measure the health consequences of exposure.").

■■■ In this case, furthermore, there are no affirmative defenses or issues of comparative liability to complicate a causation finding. The allegations against the defendants are for criminal fraud. If the elements of such fraud are proven, the defendants may not argue that the negligent actions of the smokers contributed to plaintiffs' injuries. Contributory or comparative negligence is not a defense to fraud. *See, e.g., City of New York v. Corwen*, 164 A.D.2d 212, 565 N.Y.S.2d 457, 460 (App.Div. 1st Dep't 1990) ("[C]ontributory negligence clearly has not

been regarded as a defense to intentional torts ... and that appears to remain the rule with respect to comparative negligence." (citations omitted)); Restatement (Second) of Torts § 545A ("One who justifiably relies upon a fraudulent misrepresentation is not barred from recovery by his contributory negligence in doing so.").

#### (b) Apportioning Damages

The Court's second concern in *Holmes* related to apportionment of damages between different classes of plaintiffs. *See Holmes,* 503 U.S. at 273, 112 S.Ct. 1311; *cf. Associated General Contractors,* at 543, 103 S.Ct. 897 ("The indirectness of the alleged injury also implicates the strong interest, identified in our prior cases, in keeping the scope of complex antitrust trials within judicially manageable limits."); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475 n. 11, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("[T]he task of disentangling overlapping damages claims is not lightly to be imposed upon potential antitrust litigants, or upon the judicial system."). In *Holmes,* there were at least three classes of potential plaintiffs. In addition to SIPC, there were the broker-dealers themselves. There were also the customers of the broker-dealers, who in turn could be divided between those who had bought the manipulated stocks and those who had not. Apportionment of damages posed an almost intractable problem in *Holmes* because all the potential plaintiffs were essentially claiming the same injury.

The apportionment concern does not pose a problem in the context of the present case because the plaintiffs and the insured smokers are not claiming the same injury. On the one hand, the Blues seek recovery only for the economic burden of those medical claims and procedures which they directly paid as a result of tobacco use. The plaintiffs' insureds, on the other hand, have personal injury claims for the emotional harms and consequential damages resulting from tobacco use. There is no risk of double recovery because the insureds do not have an equitable claim to the costs incurred directly by the Blues. *See* Part III.A. 3, *infra; Laborers Local 17 Health & Benefit Fund v.*

*Philip Morris, Inc.,* 7 F.Supp.2d 277, 285 (S.D.N.Y.1998) ("Because costs borne only by the Funds are recoverable only by the Funds, there can be no risk of multiple recoveries."). The Blues have standing to sue under the "business and injury" requirement of RICO.

#### (c) Sufficient deterrence

The Court's third concern in *Holmes* was to ensure that the courts have before them the plaintiff who is in the best position to vindicate society's "general interest in deterring injurious conduct." *Holmes,* 503 U.S. at 269, 112 S.Ct. 1311; *cf. Associated General Contractors,* 459 U.S. at 542, 103 S.Ct. 897 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [plaintiff] to perform the office of a private attorney general."). The proper plaintiff is the party with both the means and incentive to vindicate society's interest in the statute's enforcement. In *Holmes,* the Court observed, the broker-dealers were proper plaintiffs who had both incentive and means to pursue the litigation to its completion. The broker-dealers, in fact, had already filed a suit against the defendants.

In light of the difficulties of apportioning damages and the possibility of double recovery, the Court saw no need to allow SIPC to prosecute what amounted to the same claim as that of the broker-dealers. The Court, moreover, feared that SIPC's action was an attempt to circumvent the relative priority of its claim. *Holmes,* 503 U.S. at 274, 112 S.Ct. 1311.

In contrast to *Holmes,* in the instant suit there is no overlap in claims between the plaintiffs and their insureds. Only the Blues possess the equitable and legal claim to the costs they have incurred in the medical care and treatment of tobacco users and passive breathers of cigarette smoke. Only the Blues can claim the "injury to business or property" required by the RICO statute. The Blues are the "proper" plaintiffs; they have the necessary incentive and means to vindicate society's interest in enforcing the statute.

Courts analyzing similar allegations against these defendants have made varying determinations with respect to health insurer standing under RICO. *See, e.g., supporting standing: Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.,* 23 F.Supp.2d 771, 786 (N.D.Ohio 1998) ("Having found that proving the plaintiffs' damages flowed from defendants RICO violation is not unduly difficult, and having found there is little risk of double recovery for defendants purported RICO violations, and having found that, if proven, defendants conduct is sufficiently injurious to warrant deterrence, the factors described in *Holmes* suggest this Court not dismiss plaintiffs RICO counts on standing or proximate cause grounds."); *Kentucky Laborers District Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.,* 24 F.Supp.2d 755, 770 (W.D.Ky.1998) (RICO standing for allegations that defendants' misrepresentations "prevented the Funds from pursuing proactive measures such as smoking cessation programs and other educational efforts to reduce smoking among the Participants"); *New Jersey Carpenters Health Fund v. Philip Morris, Inc.,* 17 F.Supp.2d 324, 332 (D.N.J.1998) (RICO standing for allegations "premised upon fraud aimed directly at the Funds"); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 7 F.Supp.2d 277, 285 (S.D.N.Y.1998) (RICO standing for allegations "based on the harm to plaintiffs' infrastructure and financial stability caused by defendants' alleged attempts to deceive the plaintiffs"); *opposing standing: Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.,* 21 F.Supp.2d 664, 674 (E.D.Tex. 1998) (dismissing RICO claims); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 17 F.Supp.2d 1170, 1179 (D.Or.1998) (dismissing RICO claims).

### (2) Second Circuit Cases

Even before *Holmes,* the court of appeals for the Second Circuit had determined that proximate cause was an element of RICO's standing provision. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990) ("[T]he RICO pattern or acts must *proximately* cause plaintiff's injury.").

Shortly after *Hecht,* in *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990), the court of appeals analyzed a RICO claim against a utility company which had secured rate increases, allegedly through a pattern of racketeering. The defendants in *LILCO* obtained permission to raise utility rates from the Public Services Commission (PSC), a state regulatory body. The defendants allegedly secured these rate increases from the PSC through a series of fraudulent misrepresentations made to the PSC.

The plaintiffs in *LILCO* were the ratepayers whose electric bills had gone up as a result of these rate increases. The court of appeals approved the ratepayers' standing to sue under RICO despite the fact that the defendants' misrepresentations had been directed entirely toward a third party, the PSC. There were several important factors which supported the plaintiffs' standing in *LILCO.* First, as in the instant case, the ratepayers had sustained economic injuries giving rise to the RICO claim. Second, they were the intended target of the alleged racketeering scheme. While the misrepresentations themselves were directed at the PSC, one of the ultimate objects of the scheme was to defraud the ratepayers of their property in the form of higher rates. In the instant case, plaintiffs are also allegedly an intended target of the defendants' racketeering.

The court of appeals faced a similar RICO problem in *Standardbred Owners Assoc. v. Roosevelt Raceway Associates, L.P.,* 985 F.2d 102 (2d Cir.1993). In *Standardbred Owners,* the defendants purchased a horse racetrack with financing provided by a municipal bond. In order to secure the bond the defendants allegedly made fraudulent misrepresentations to the public entity responsible for approving the bond. They gave numerous assurances to the public entity that the racetrack would remain open and continue to function as an asset to the community after the defendants had assumed control of the operation. As a result of these misrepresentations, the bonds were approved and the defendants purchased the racetrack.

Immediately after the purchase, the defendants allowed the racetrack to fall into disrepair. Within a year they sought to shut it

down and petitioned to have the racetrack re-zoned for commercial purposes—thus multiplying the value of the land.

The plaintiffs in *Standardbred Owners* did not include the public entity through whom the financing for the purchase was secured. Instead, the plaintiffs were individuals and groups who derived their livelihood from the track's operation—horse owners, trainers, drivers, grooms, blacksmiths, veterinarians, racing officials, and pari-mutuel clerks. *Id.* at 103.

The trial court dismissed the RICO action on the ground that the plaintiffs lacked standing. The court of appeals reversed. "The test of proximate cause," the court stated, "is whether the defendant's acts 'are a substantial factor in the sequence of responsible causation,' and whether 'the injury is reasonably foreseeable or anticipated as a natural consequence.' " *Id.* at 104 (quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23–24 (2d Cir.1990)). The court found that the plaintiffs' injuries were to be reasonably anticipated as a natural consequence of the defendants' fraudulent scheme to secure public financing and purchase the track. It emphasized the interdependent relationship between the plaintiffs and the racetrack which served as the basis for their livelihood:

> [P]laintiffs were an integral and inseparable part of Roosevelt Raceway. An injury to the Raceway was inevitably an injury to them. A finding of causal relation under these circumstances comports with the demands of justice without at the same time opening the floodgates to administratively inconvenient or unmanageable litigation.

*Id.* at 104 (citations omitted).

As in *LILCO*, the alleged fraud in *Standardbred Owners* was directed at a third party, the public entity approving the financing for the purchase of the track. As with both *LILCO* and the instant case, the defendants in *Standardbred Owners* were well aware that the economic damages flowing from their fraudulent conduct would be borne by a separate group of individuals, different from the entity to whom the misrepresentations were primarily directed. As with the instant case, the court noted that

some of the plaintiffs' injuries in *Standardbred Owners* were the result of their own reliance on the defendants' misrepresentations. *See id.* at 104–05 ("[P]laintiffs purchased, relocated and reconstructed capital equipment for use at the track, and designed their purchases and training of horses with the intent to race them at the track.").

As in *Standardbred Owners*, it was clearly foreseeable to the defendants in the instant case that economic damages flowing from the medical costs of tobacco use would be borne by the plaintiffs. Tobacco related medical injuries are inevitably an injury to the Blues. The plaintiffs allege that their injuries were also an intended consequence of the defendants' racketeering, since the medical treatment smokers received inured to the financial benefit of the tobacco industry. As with *Standardbred Owners*, furthermore, the finding of proximate cause in the instant case will not result in "opening the floodgates to administratively inconvenient or unmanageable litigation." *See id.* at 104.

Most recently, in *GICC Capital Corp. v. Technology Finance Group, Inc.*, 30 F.3d 289 (2d Cir.1994), the court of appeals for the Second Circuit addressed RICO allegations of a financial creditor who had suffered economic losses when its debtor was stripped of its assets through the defendants' alleged pattern of racketeering. The trial court had dismissed the complaint in *GICC*. The defendants' looting of the debtor's assets, the trial court had found, was the proximate cause only of the debtor corporation's injuries. *Id.* at 290. The plaintiff's injuries were therefore too "derivative" to support recovery. *Id.* at 292.

The court of appeals for the Second Circuit reversed the trial court's findings and held that the creditor had standing under RICO. It was foreseeable and intended that the plaintiff would suffer economic losses as a result of the defendants' racketeering:

> When a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have standing. Their injury is "reasonably foreseeable or anticipated as a natural consequence."

*Id.* at 293 (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 24 (2d Cir. 1990)).

The Blues' RICO standing is consistent with the courts' holdings in *LILCO, Standardbred Owners,* and *GICC.* As in these cases, the Blues' economic injuries are alleged to have been both the foreseeable and the intended consequence of the defendants' racketeering. It is alleged that the defendants directed their misrepresentations at both smokers and the Blues. It is alleged that both the Blues and the smokers relied on these misrepresentations. Even if the Blues had not specifically relied on the defendants' fraud, they would nevertheless have RICO standing under the holdings of these three Second Circuit cases.

### (3) "Rule" of Remoteness

Defendants argue that the plaintiffs' claims should be barred by a common law "rule of remoteness."

■■■ The defendants' reliance on common law principles is suspect in light of the Second Circuit's holding in *Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 237 (2d Cir. 1996), that the issue of RICO proximate cause is primarily one of statutory design. *See id.* (preeminent concern for RICO standing purposes is whether the plaintiff was "within the class the statute sought to protect and [whether] the harm done was one that the statute was meant to prevent"); *see also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n. 13, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("It bears affirming that in identifying the limits of an explicit statutory remedy, legislative intent is the controlling consideration.").

■■■ The plaintiffs are within the scope of RICO's protection. They have suffered the type of economic injuries the statute is designed to compensate for and their injuries flow directly from the acts of racketeering the statute is designed to deter. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275 (1985) ("Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.").

Nevertheless, an analysis of common law principles is germane in so far as the statute incorporates the evolving body of common law into RICO's standing provision. *See Holmes* 503 U.S. at 267–68, 112 S.Ct. 1311; *cf. Associated General Contractors,* 459 U.S. at 533, 103 S.Ct. 897 ("[T]he frequent references to common-law principles imply that Congress simply assumed that antitrust damages litigations would be subject to constraints comparable to well-accepted common-law rules applied in comparable litigation.").

■■■ With respect to the "rule of remoteness," the defendants are simply mistaken that the common law embraces a rule which bars all claims for "indirect" injuries. The analysis of proximate cause is driven by considerations of policy, fairness, and practicability, not by blind adherence to ancient rigid legal classifications and abstractions. The Supreme Court, in both *Holmes* and *Associated General Contractors,* was careful to point out that the issue of proximate cause is not conducive to black letter rules such as those proffered by the defendants. See *Associated General Contractors,* 459 U.S. at 536–37, 103 S.Ct. 897 ("[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. Instead, previously decided cases identify factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances."); *see also Holmes,* 503 U.S. at 272 n. 20, 112 S.Ct. 1311 (quoting *Associated General Contractors* and stating, "our use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text").

Ultimately the concept of proximate cause requires the courts to distinguish between the conduct our society wishes to punish and deter from that which it is prepared to encourage or tolerate. This determination is primarily one of policy, requiring a highly flexible and case specific approach. As a leading treatise on tort law summarizes the matter:

"Proximate cause"—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct.... Some boundaries must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.

This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which the plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands, or of what is administratively possible and convenient.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed.1984); *see also Associated General Contractors*, 459 U.S. at 537 n. 34, 103 S.Ct. 897 (" 'What we do mean by the word "proximate" is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.' " (quoting *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 103 (N.Y.1928) (Andrews, J. dissenting))).

The Court in *Holmes* identified three principal policy considerations underlying the proximate cause analysis. As already noted, Part III.A.2(b)(1), *supra*, the instant suit is compatible with these policy considerations. No troubling issues of apportionment or multiple causation are now presented. The plaintiffs are fully capable of litigating their claim for RICO injuries and vindicating public policy. Society's general interest in RICO's enforcement, which depends upon the plaintiffs' standing, is an important policy consideration which weighs heavily in favor of finding proximate cause. *Cf.* Fed.R. Civ.P. 23(b)(3) (class action, "superior to other available methods for the fair and efficient adjudication of the controversy").

In addition to the policies identified in *Holmes,* courts have always utilized the concept of foreseeability as a touchstone for proximate cause analysis. In *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23–24 (2d Cir.1990), the court of appeals for the Second Circuit defined RICO proximate cause in terms of foreseeability and substantiality:

For our purposes, the RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence.

Foreseeability is relevant to the issue of deterrence because predictable harms can be prevented *ex ante.*

Because it is based upon social policy and justice, the common law of proximate cause has drawn a sharp distinction between acts which are deliberate and intentional from those which involve mere negligence. Those who have acted intentionally or with reckless disregard for the health and safety of others have difficulty convincing the law that it is unjust or unwise for society to hold them responsible for the damages which foreseeably follow from their deliberate actions. The law has a strong interest in deterring such intentional efforts to harm others. The Restatement of Torts reflects this policy of widening the scope of liability for intentional acts, particularly where there is a potential for serious harm and a high degree of moral culpability.

Where a person has intentionally invaded the legally protected interests of another, his intention to commit an invasion, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for resulting unintended harm.

Restatement (Second) of Torts § 435B.

In the instant case, the defendants' alleged transgressions were both intentional and foreseeable. If, as alleged, the defendants conducted a decades long scheme to deceive the American public and its health providers concerning the addictive characteristics and health hazards of their tobacco products, and if they conspired to deprive smokers of safer or less addictive tobacco products, then their actions can properly be characterized as illegal and deliberate criminal fraud. The de-

gree of the defendants' moral wrong, and the seriousness of the harm they allegedly inflicted, are factors which weigh heavily in favor of finding proximate cause.

Defendants argue that the "rule of remoteness" precludes consideration of factors such as foreseeability, practicability, and intentionality. See Defendants' Brief at 6 ("The legal rule prohibiting remote claims is based on legal policy considerations and does not depend upon whether indirect injury to the payor (insurer) is foreseeable, or whether causation-in-fact is shown, or whether the tortfeasor acted willfully or negligently.").

To support this proposition, they rely on nineteenth century caselaw cited in dicta from *Holmes.* In *Holmes,* the Court did mention an 1882 treatise for the proposition that, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Holmes,* 503 U.S. at 268–69, 112 S.Ct. 1311 (citing 1 J. Sutherland, Law of Damages 55–56 (1882)) (cited in Defendants' Brief at 8).

Putting aside the fact that a century of radical change in society, its institutions, and tort and criminal law lies between this 1882 statement of the law and the present, close scrutiny of the quoted passage reveals that it is of little use to defendants in this case. The 1882 treatise refers to plaintiffs whose injuries flow *"merely"* from the misfortunes of third parties. In the instant case, the plaintiffs have alleged that they themselves were an intended target of the defendants' racketeering. They have alleged that a substantial portion of their injuries flowed directly from their own reliance on the defendants' misrepresentations. Plaintiffs' claimed damages did not flow "merely" from the misfortunes of others.

The 1882 treatise also states that indirect victims are *"generally"* not allowed to recover. For policy and practical reasons, the law has always recognized a number of important exceptions to a "rule" barring recovery for injuries to others.

Loss of consortia claims, for example, allow third parties to recover for the damages they suffer as a result of the deaths or injuries sustained by a spouse, parent, or child. The payment of medical damages by a spouse or parent is a recoverable item in a loss of consortium claim. 1 *Fowler V. Harper & Fleming James, Jr., The Law of Torts* §§ 8.8, 8.9 (1956). One reason that such claims are allowed is that losses by a parent or child are foreseeable to a tortfeasor. Another explanation is that the spouse or parent is obligated to care for the injured family member. *See, e.g., Hughey v. Ausborn,* 249 S.C. 470, 154 S.E.2d 839, 841 (S.C.1967) ("A father and husband is bound to furnish the necessities of life to his minor child and wife and among such are necessary medical service and hospitalization. The father's and husband's right to recover from a tort-feasor for such items of expense is based on his obligation to furnish them."); *Doss v. Sewell,* 257 N.C. 404, 125 S.E.2d 899, 903 (N.C.1962) ("Necessary medical expense of an unemancipated infant is the responsibility of the father, if living, of the mother if he is not. A separate cause of action for recovery of such expenses exists in favor of the parent."); *Quinn v. Gilormine,* 32 Conn.Supp. 156, 344 A.2d 275, 276 (Conn.Super.Ct.1975) ("[A] wife is responsible for the medical expense of her husband. Her corresponding right of action against [a] third party whose liability occasioned that expense is simple and inexorable logic and equity grounded in the married woman property law." (citations omitted)).

Recognizing a direct cause of action on the part of the Blues is consistent with the role plaintiffs play in today's society. In the same way that a spouse or parent has an obligation to provide for the medical injuries of his spouse or child, non-profit medical providers such as the Blues have an obligation to supply medical care to their covered populations. More and more, medical providers such as the Blues have assumed the responsibility for ensuring that individuals have access to medical care. For the nearly 70 million people, one out of every four Americans, who rely on the Blues to provide their medical care, plaintiffs occupy a type of *parens patriae* relationship with their insureds which is analogous to the parent-child relationship.

The analogy to loss of consortia claims is applicable to this case for another reason. As previously noted, defendants' position is that the Blues have not suffered a RICO injury to their business and property because their economic losses are "derivative" of personal injuries. Courts' treatment of loss of consortia claims demonstrate how the decision to label an injury "derivative" is itself a subjective and policy-based analysis. A growing number of jurisdictions have chosen to recognize consortia claims as direct actions which are independent of one brought by an injured spouse. As one court summarized the matter:

> The cause of action for consortium occasioned by an injury to one marriage partner is a separate cause of action belonging to the spouse of the injured marriage partner. A wife's loss of consortium cause of action is derivative "in the sense it arose out of or was occasioned by an injury to her husband." However, loss of consortium is a direct injury to the spouse who has lost the consortium.

*Peeples v. Sargent*, 77 Wis.2d 612, 253 N.W.2d 459, 471 (Wis.1977) (citations omitted) (quoting *Schwartz v. Milwaukee*, 54 Wis.2d 286, 195 N.W.2d 480, 484 (Wis.1972)); *see also Feltch v. General Rental Co.*, 383 Mass. 603, 421 N.E.2d 67, 70 (Mass.1981) ("The view that a consortium claim is 'derivative' has been rejected by the commentators. Those courts which view the action as independent have analyzed the differences in the damages sustained by each spouse and have concluded that these differences create distinct causes of action, despite the fact that the consortium action and the negligence action arise out of injuries to one spouse."); *Fuller v. Buhrow*, 292 N.W.2d 672, 675 (Iowa 1980) ("The distinct nature of each spouse's right to consortium is perhaps most clearly evidenced by the fact that either spouse may sue for loss of consortium by means of an alienation of affections action even though the other spouse was a joint tortfeasor."); *Lantis v. Condon*, 95 Cal.App.3d 152, 157 Cal.Rptr. 22, 24 (Cal.App.1979) ("Although the wife's cause of action 'arises' from the bodily injury to her husband, the injury suffered is personal to the wife. Loss of her husband's consortium impairs a wife's inter-ests which are wholly separate and distinct from that of her husband.... From the vantage point of the negligent defendant, [the wife] is simply a foreseeable plaintiff to whom he owes a separate duty of care." (citations omitted)); *LaBonte v. National Gypsum Co.*, 110 N.H. 314, 269 A.2d 634, 638 (N.H.1970) ("[T]he right of action for loss or impairment of consortium granted to the wife ... is a separate and distinct right from that of her husband to recover for her separate and distinct loss of consortium which results to her from the negligent injury to her husband.").

Even jurisdictions which view the claims as derivative recognize that loss of consortia claims possess many of the characteristics of a separate and independent action. *See, e.g., Board of Commissioners v. Nevitt*, 448 N.E.2d 333, 341 (Ind.Ct.App.1983) ("[A]lthough a wife's claim for loss of consortium is 'derivative' from her husband's claim for his injuries, the husband's inability to recover for his injuries does not necessarily preclude his wife's claim for loss of consortium."); *Brown v. Metzger*, 118 Ill.App.3d 855, 74 Ill.Dec. 405, 455 N.E.2d 834, 838 (Ill.Ct.App.1983) ("Though derivative, the loss of consortium claim is still a separate cause of action. Thus, we hold, as courts in several other states have held, that a release executed only by the impaired spouse does not bind the deprived spouse and ... does not bar the deprived spouse's cause of action for loss of consortium.").

With respect to the sale of addictive substances—such as tobacco—the common law has long recognized a direct action on the part of the spouse of the drug's victim. The Restatement (Second) of Torts states:

> One who unlawfully sells or otherwise supplies to one spouse a habit-forming drug with knowledge that it will be used in a way that will cause harm to any of the legally protected marital interests of the other spouse, is subject to liability for harm caused by the drug to those interests unless the other spouse consents to the acquisition or use of the drug.

Restatement (Second) of Torts § 696. Under the Restatement, the spouse's claim un-

der section 696 is not derivative. *See id.* at comt. a ("[A] cause of action under this Section is not a derivative action."); *see also, e.g., Hoard v. Peck,* 56 Barb. 202 (N.Y.Gen. Tr.1867); *Holleman v. Harward,* 119 N.C. 150, 25 S.E. 972 (N.C.1896); *Flandermeyer v. Cooper,* 85 Ohio St. 327, 98 N.E. 102 (Ohio 1912); *Moberg v. Scott,* 38 S.D. 422, 161 N.W. 998 (S.D.1917); *Pratt v. Daly,* 55 Ariz. 535, 104 P.2d 147 (Ariz.1940).

The trend in modern tort law generally has been to reject the rigid and formalistic barriers which once prohibited third parties from recovering for "indirect" injuries. *See, e.g., MacPherson v. Buick Motor,* 217 N.Y. 382, 111 N.E. 1050 (1916) (discarding notion of "privity" as a limitation of tort injuries); *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 495 A.2d 107 (N.J. 1985) (shedding notion that party may not recover in tort for purely economic injuries without physical damages).

In so far as RICO incorporates common law principles of proximate cause, standing analysis must reflect this continuing evolution of tort and criminal law. *See Associated General Contractors,* 459 U.S. at 533 n. 28, 103 S.Ct. 897 ("The common law, of course, is an evolving body of law. We do not mean to intimate that the limitations on damages recoveries found in common-law actions in 1890 were intended to serve permanently as limits on Sherman Act recoveries.").

In place of the rigid formalism of the past, courts have increasingly turned to more flexible and policy oriented standards to circumscribe the limits of tort law. The result has been a liberalization of the law of standing and a substantial broadening of the classes of plaintiffs who are allowed to bring suit.

Under the modern approach, courts have allowed "indirect" victims to recover in a wide variety of circumstances. Accountants, auditors, attorneys, surveyors, notaries, architects, weighers, termite inspectors, and telegraph companies have all been held liable for the "indirect" injuries they caused to third parties. *See, e.g., H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (N.J.1983) (independent auditor liable to third party for preparing inaccurate public financial statement); *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656 (Ill.1969) (surveyor liable for inaccurate boundary survey to third party who subsequently purchased land); *Immerman v. Ostertag,* 83 N.J.Super. 364, 199 A.2d 869 (N.J.Super.Ct. Law Div.1964) (notary public attesting signature of wrong person); *Hardy v. Carmichael,* 207 Cal.App.2d 218, 24 Cal. Rptr. 475 (Cal.App.1962) (inspector liable for negligent inspection for termites to third party who subsequently purchased home); *M. Miller Co. v. Central Contra Costa Sanitary Dist.,* 198 Cal.App.2d 305, 18 Cal.Rptr. 13 (Cal.App.1961) (engineer liable to third party for faulty soil tests); *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (Cal.1961) (attorney liable for negligent drafting of will to third party who otherwise would have received proceeds), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (Cal.1958) (en banc) (notary public liable for negligent drafting of will to third party who would have otherwise received proceeds); *United States v. Rogers & Rogers,* 161 F.Supp. 132 (S.D.Cal.1958) (architect held liable to third party for failing to supervise for conformity with specifications); *Western Union Tel. Co. v. Mathis,* 215 Ala. 282, 110 So. 399 (Ala.1926) (telegraph company liable for negligent delay in transmission to third party who lost contract as result); *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (N.Y.1922) (public weigher liable to third party).

In all of these cases, the courts rejected the facile approach of relying upon labels such as "direct" or "derivative." The injuries were "derivative" in some sense of the injuries sustained by another party. Yet this fact alone was not determinative. Policy considerations, including notions of foreseeability, supported a finding of liability. The defendants had reason to know that their negligence would result in a specific type of injury. It was foreseeable, furthermore, that this injury would be sustained by a specific class of individuals.

A leading example of modern tort law's approach to "indirect" injuries is *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16, 19 (Cal.1958) (en banc), in which the Supreme Court of California held that a notary was

liable to a third party in tort for the negligent drafting of an invalid will. The injured third party was the foreseeable victim who would have received proceeds from the will had it been properly executed. Following the lead of such cases as *MacPherson v. Buick Motor*, 217 N.Y. 382, 111 N.E. 1050 (1916), the court rejected the notion that the plaintiff should be barred from recovery because of a lack of privity between the victim and the tortfeasor. Instead, it articulated six public policy considerations that would be weighed to determine the extent of a wrongdoer's liability to third parties. They were: 1) whether the transaction was intended to affect the plaintiff, 2) the degree of foreseeability, 3) the certainty of the plaintiff's injury, 4) the closeness of connection between the conduct and the harm, 5) the moral blame of the conduct, and 6) the policy of general deterrence. Stating the rule for dealing with new fact configurations, the court wrote:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Biakanja v. Irving*, 49 Cal.2d 647, 320 P.2d 16, 19 (Cal.1958) (en banc). Although the court in *Biakanja* chose to analyze the case under the rubric "duty," rather than proximate causation, the case involved the same issue of defining limits of liability. *See also J'Aire Corp. v. Gregory*, 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (Cal.1979) (building contractor who had inexcusably delayed in fulfilling its contractual duty to repair a restaurant was responsible in tort to the lessee restaurant occupying the building).

Applying the standards enunciated by today's courts, it is difficult to imagine a set of circumstances which would militate more strongly in favor of a finding of proximate cause and liability than the present one. If the allegations are to be believed, the defendants in this suit are responsible for one of the most colossal and reproachful frauds in the history of American society. If proven to be true, the allegations demonstrate that the defendants intentionally bargained away the lives and health of tens of millions of Americans for profit. While the law is forced to address allegations of malfeasance on a continual basis, rarely if ever have American courts been faced with allegations of fraud so nefarious in nature, so wide in scope, or so broad in impact. The moral blame attached to such conduct, and society's policy in preventing harms in the future, could scarcely argue more strongly in favor of a finding of proximate cause.

The defendants' conduct was allegedly intended to affect the plaintiffs. If true, the allegations demonstrate that the defendants have been reaping profits at the health industry's expense. Simply stated, the defendants would not have been in a position to realize the enormous profits of its industry without the compelled and unknowing subsidization by organizations such as the Blues. Not only were such consequences of this fraud foreseeable, they were specifically intended, according to the complaint.

There is a high degree of certainty that the plaintiffs have suffered injury if in fact the allegations of the complaint are proven. Plaintiffs should be able to demonstrate which claims they have paid and what portion of these claims can be apportioned to tobacco use. Conflicting scientific evidence will need to be taken into account in testing plaintiffs' claims, as it is in virtually all mass torts, but the calculation of damages may prove to be more accurate in this case than it would be if the individual smokers were forced to prove their own medical damages. Statistical analysis may avoid the difficulty of determining with a reasonable degree of certainty whether any particular individual's injury was caused by tobacco use. *See United States v. Shonubi*, 895 F.Supp. 460, 517 (E.D.N.Y. 1995) ("In mass torts, proof of causation often requires the use of statistically based epidemiological proof."); *In re "Agent Orange" Prod. Liability Litig.*, 597 F.Supp.

740, 835 (E.D.N.Y.1984); Margaret A. Berger, *Evidentiary Framework, in Reference Manual on Scientific Evidence* 37, 93–97 (Federal Judicial Center 1994); Michael O. Finkelstein, *Quantitative Methods in Law: Studies in the Application of Mathematical Probability and Statistics to Legal Problems* (1978); Hans Zeisel & David Kaye, *Prove It with Figures: Empirical Methods in Law and Litigation* (1997); *The Evolving Role of Statistical Assessments as Evidence in the Courts* (Report of the Panel on Statistical Assessments as Evidence in the Courts, Stephen E. Fienberg ed., 1989); Deborah R. Hensler, *Resolving Mass Toxic Torts: Myths and Realities,* 1989 U.Ill.L.Rev. 89, 90 (aggregative procedures provide best possible match between victims' losses and compensation).

In any event, once the other elements of a cause of action have been proven, considerable leeway and flexibility in establishing damages is permitted. *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562–63, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ("[T]here is a clear distinction between the measure of proof necessary to establish the fact that petitioner ·had sustained some damage and the measure of proof necessary to enable the jury to fix the amount.... The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."); *United States Football League v. National Football League,* 842 F.2d 1335, 1379 (2d Cir.1988) ("[Supreme Court decisions] simply restate the established principle that where damages have been shown to be attributable to the defendant's wrongful conduct, but are uncertain in amount, the defendant bears the risks of those uncertainties.").

Contrary to defendants' admonitions, recognizing plaintiffs' direct claim will not open the floodgates of litigation. Defendants' conduct was allegedly intentional and foreseeable. Their actions were allegedly specifically intended to injure the plaintiffs in so far as the defendants anticipated and depended upon the plaintiffs' subsidization of their clients' health. The claims do not raise unusual or especially difficult issues with respect to the ascertainment or apportionment of damages. Their injuries do not involve issues of comparative liability or double recovery.

Finally, the defendants' alleged misconduct entails moral opprobrium of extraordinary proportions. Society has an especially compelling interest in deterring future harms of the type and magnitude alleged, and plaintiffs are uniquely suited to vindicate society's interest in the litigation. Not only do the plaintiffs have the necessary resources and interests to pursue the litigation effectively, but they stand in the best position to remedy the wrongs defendants have allegedly inflicted upon the American health care system.

The Blues' RICO standing allegations are analogous to those accepted by the Supreme Court in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982):

> The harm to [plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely " 'the type of loss that the claimed violations ... would be likely to cause.' "

(quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969))).

### 3. Subrogation

Defendants argue that the plaintiffs' action to recoup their medical expenses should be relegated to an action in subrogation. That is to say, the suit should be by or on behalf of the insured smokers, with the plaintiffs' recovery attendant upon the insureds' legal actions. Confining the plaintiffs to an action of subrogation would be inappropriate for two reasons. First, it would frustrate the purposes of RICO by denying standing to a party whose injuries are within the designed scope of the statute. This would result in the underenforcement and frustration of the

statute. Second, it would be unjust to confine the plaintiffs to an action in subrogation because the present action is distinguishable from the traditional subrogated claims in cases where individual plaintiffs are injured.

The Blues are dissimilar from the typical insurer for whom the doctrine of subrogation was created. Plaintiffs are not simply insurers. They are providers of the fundamental health care of the nation. They perform a critical public function in a society which, almost alone in the industrialized world, has chosen to delegate the responsibility for the funding of health care to private entities. Plaintiffs directly purchase health care on behalf of their insured population. The collection of premiums and the allocation of risk among the insured pool is only one way in which they fulfill this public function. They are not ordinary passive insurers, but almost quasi governmental entities in their effect on health care. It would be a mistake of public policy and a perversion of common law to superimpose the doctrine of subrogation, created for one-on-one disputes, upon the plaintiffs responsible for the care of tens of millions, simply because they provide insurance as one aspect of their duty to provide health care. Compare cases cited in Part III. A.2(b)(3), *supra*.

Subrogation doctrine is, in any event, ill applied here. There are no issues, such as comparative liability, which implicate the doctrine. Application of subrogation theory in this case would undermine equitable substantive and procedural principles by unnecessarily complicating and confusing the litigation.

Finally, the plaintiffs should be allowed to bring their claim as a direct action because doing so is, as has already been demonstrated, consonant with modern tort law's approach to third party injuries. See Part III.A.2(b)(3), *supra*. Under current concepts of duty and proximate cause, plaintiffs have alleged sufficient facts to state a direct cause of action.

Plaintiffs may not be relegated to an action in subrogation because they are not like the traditional insurers for whom the doctrine of subrogation was designed. Unlike a classic insurer, the Blues are not mere passive recipients of premiums whose principal interest lies in allocating risk. They purchase and distribute health care. *See Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406 (7th Cir.1995). Plaintiffs play an active role in shaping the way health care is delivered in this country. More than eighty percent of the hospitals in the United States and nearly ninety percent of the nation's physicians contract with the Blues to treat their 70 million insureds. Plaintiffs negotiate and contract among these providers for rates and conditions of service. They actively shape the form of health care by controlling what medical procedures are available to their insureds, when those procedures shall be available, and how they will be performed.

Since plaintiffs were created in the 1930s as a response to problems in the funding of health care, financing of health care has undergone a radical restructuring. Entities such as the Blues have been increasingly relied upon to make health care affordable for most Americans. Americans are no longer in a position to pay for health care on a fee-for-service basis, even with a traditional insurer's assistance.

Today subscribers often rely on organizations such as the Blues not only to allocate risk, but also to help establish and administer networks of hospitals and physicians to make health care more affordable. The Blues are the largest provider of such managed care programs in the country. Some 45 million individuals are enrolled in some type of managed care administered by the Blues. Through these managed care programs plaintiffs take an active and leading role in shaping the delivery of health care in this country. Directly and indirectly, medical insurers-providers such as the Blues decide what medical procedures will be offered, to whom they will be offered and when and how they will be offered.

The law cannot ignore the reality that an economic injury to the Blues is not merely an injury to an ordinary insurance company. It is a direct threat to the availability of affordable health care to Americans and a menace

to the quality of care that is offered in this country.

Subrogation, furthermore, is ill applied in the context of this case. Its use would serve none of the equitable principles for which it was intended. Defendants' argument that plaintiffs must be restricted to an action in subrogation because to do otherwise would deprive the defendants of important affirmative defenses they might otherwise be able to raise is without merit. There are no affirmative defenses shown by defendants to be available to them under RICO. Cf. cases in Part III.A.2(b)(3) (contributory negligence of spouse not a defense in claim for loss of consortium in some states). In a case of intentional, criminal fraud, such as is alleged here, there are no issues of comparative liability. See, e.g., Restatement (Second) of Torts § 545A ("One who justifiably relies upon a fraudulent misrepresentation is not barred from recovery by his contributory negligence in doing so."). The only questions of fact are whether or not the defendants made the misrepresentations in question and whether such misrepresentations caused the plaintiffs' injuries. The resolution of these issues will not be affected by the decision to characterize the suit as one of subrogation or direct injury. Because there are no potential issues of comparative liability, there appears to be no practical advantage to the courts or the parties in prosecuting this litigation as one in subrogation.

The defendants contend subrogation is necessary in order to guard against the possibility of double recoveries and to protect the claims of individual smokers. This argument is unpersuasive. The plaintiffs have allegedly paid more than a billion dollars providing medical treatment for injuries allegedly caused by the tobacco industry. The individual smokers have no equitable claim to the money paid by the Blues to treat their smoking related illnesses.

The use of subrogation would unnecessarily complicate the tobacco litigation and burden it with numerous transactions costs. Under the traditional formulation of subrogation, the subrogor possesses the power to frustrate the subrogee's equitable rights by "selling out" the subrogee's interests as a means of increasing the value of its own claims. Insurers frequently have difficulty identifying and protecting their compensatory claims from insureds who have this interest in compromising the insurer's rights. See, e.g., Mahler v. Szucs, 135 Wash.2d 398, 957 P.2d 632, 641 (Wash.1998) (en banc) ("The potential for conflict of interest abounds in such [subrogation] circumstances.... As a result of these new conflicts, some courts initially refused to allow subrogation in the personal injury context, basing their denials on the common law rules against splitting causes of action and assigning personal injury claims.").

It would be unjust and inefficient to require the plaintiffs to monitor the unwieldy corpus of tobacco suits currently in progress throughout the nation so that they could intervene in the thousands of smokers' and passive smoke breathers' suits to protect their interests. The modern trend in subrogation is to recognize that the insurers who pay are the proper parties to bring the suit. They are the parties who have suffered the direct loss and are often the only ones who have the incentive to vindicate their interests. Along with this recognition has come an appreciation of the need to facilitate recovery for entities such as the Blues to reduce premiums, provide more access to affordable health care, and properly allocate medical resources. Any recovery by health insurers will in turn benefit the whole class of insureds.

It is simpler and more efficient if the Blues can aggregate their claims and bring them directly. In the context of mass injuries, insureds may be too diffuse and their interests too diverse to make them effective vindicators of the law. Authorizing a direct suit by Blue Cross recognizes that society has suffered and that the payor is in the best position to remedy those wrongs to society and itself. In this sense the policy of RICO already described, the needs of mass tort litigation, and the modern approach to claims of insurers coalesce.

Mass torts involve unique legal and procedural complications arising from the long periods over which the injuries are often sustained and the numerous geographic ar-

eas and legal jurisdictions implicated. The doctrine of subrogation is often incompatible with the efficient resolution of such mass tort claims because it was not formulated or developed with the mass tort context in mind. As an equitable doctrine, its use is limited to those contexts in which it offers the most complete and efficient remedy available. *See, e.g., Dantzler Lumber & Export Co. v. Columbia Casualty Co.*, 115 Fla. 541, 156 So. 116, 119–20 (Fla.1934) (" '[W]herever a court of equity will relieve against a transaction, it will do so by the remedy of subrogation, *if that be the most efficient and complete that can be afforded.*' ") (quoting 25 R.C.L. 1313 (emphasis added)).

The essential inquiry in the present case is to determine which procedures will allow the most efficient and just means for the parties to adjudicate their claims. There are substantial benefits to all parties as well as to the courts if the plaintiffs are allowed to resolve their claims in as few litigations as possible. The use of subrogation in this case would serve none of the purposes for which subrogation was intended. It would threaten to undermine those ends by unnecessarily complicating and frustrating the litigation.

Courts have an obligation, both for substantive and related procedural reasons, to control a huge litigation such as the instant one to facilitate its "just, speedy, and inexpensive disposition." Fed.R.Civ.P. 16(c)(16). That obligation precludes a subrogation proceeding and requires trial on the single legal theory of RICO.

### B.  ANTITRUST

Plaintiffs also claim treble damages under federal antitrust laws. The Clayton Act standing provision has virtually the same wording as the RICO statute. See 15 U.S.C. § 15 ("Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."). Theoretically the same analysis allowing the suit to proceed on a RICO theory may support a claim under antitrust law. *See Associated General Contractors v. Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

Public policy is sufficiently vindicated by proceeding under one theory or the other.

The RICO provisions are more aptly applied to the case at hand. Allowing the Blues to proceed on both RICO and antitrust theories would add to costs of discovery, complicate the trial, and might unnecessarily burden the jury.

The motion to dismiss the antitrust claims is denied, but, subject to motions, the claims will not proceed. It is duplicative. *Cf.* Fed. R.Civ.P. 8(a) (alternative pleading permitted). Should the plaintiffs prove their case under RICO their recovery will be maximized and there will be no reasons to prosecute the case under any other theory. Should the jury decide against plaintiffs, it would be unlikely that they could succeed under any other theory, and all other claims will, subject to motions, be dismissed.

In claims of mass torts, such as these presented by the Blues, the courts have power to control the litigation to provide a viable method of adjudication. *Cf.* Fed.R.Civ.P. 1 (just, speedy and inexpensive determination of action), 16 (management of cases by court), 23 (numerosity), 42(b) (separate trials of severable issues).

### C.  STATE LAW

There are many state law claims. They involve statutory and common law provisions which vary from state to state. While arguably valid, as in the case of the antitrust claims, they will not, subject to motions, be permitted to go forward in this litigation. Prosecution on so many diverse theories would make case management almost impossible.

Plaintiffs have chosen to bring a massive action. They must be deemed to have consented to a limitation of theory that permits a practicable litigation. Subject to motions, the state based claims will not proceed even though the motion to dismiss them is denied. Should plaintiffs lose on their RICO theory, the state claims will, subject to motions, be dismissed. See Part 111.13, *supra.*

### D.  INDISPENSABLE PARTIES AND PLEADING FRAUD

Defendants' contention that the smokers are indispensable parties is unfounded. This

is not a case based upon subrogation, but a direct action under RICO. *See* Part III.A, *supra.*

No further details in pleading are necessary. The complaint is already sufficiently prolix.

## IV. CONCLUSION

The motion to dismiss is denied. Discovery will proceed under the direction of the magistrate judge. The case will be tried by the court and a jury in January 2000.

SO ORDERED.