COMMONWEALTH of Pennsylvania by D. Michael FISHER, in his official capacity as Attorney General of the Commonwealth of Pennsylvania

v.

PHILLIP MORRIS, INC.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T. Industries, PLC.; the American Tobacco Company, Inc., c/o Brown & Williamson Tobacco Corporation; Lorillard Tobacco Company; Liggett Group, Inc.; United States Tobacco Company; the Tobacco Institute, Inc.; the Council for Tobacco Research – U.S.A., Inc.; Smokeless Tobacco Council, Inc.; and Hill & Knowlton, Inc.

The County of Allegheny, Appellant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 14, 1999.

Decided Aug. 9, 1999.

Joel M. Ressler, Harrisburg, Thomas L. VanKirk, Pittsburgh, Reeder R. Fox, Philadelphia, for appellee.

William Pietragallo, II, Kerry A. Fraas, Henry M. Sneath, J. Kerrington Lewis, Pittsburgh, for appellant.

Before COLINS, President Judge, DOYLE, J., McGINLEY, J., SMITH, J., FRIEDMAN, J., KELLEY, J. and LEADBETTER, J.

**ORDER**

LEADBETTER, Judge.

AND NOW, this 9th day of August, 1999, upon consideration of the praecipe of appellant Allegheny County to discontinue appeals, which is treated as a motion to discontinue, the motion is GRANTED and the above appeals of Allegheny County shall be marked discontinued and ended, with prejudice.

Dissenting opinion by Judge KELLEY.

KELLEY, Judge, dissenting.

I respectfully dissent.

On April 21, 1997, the Commonwealth of Pennsylvania, acting by and through Attorney General D. Michael Fisher, filed the instant complaint in the Court of Common Pleas of Philadelphia County (trial court) asserting various claims for monetary damages and equitable and injunctive relief against the named Defendants. In the complaint, the Attorney General alleged that:

> [H]e brings this action pursuant to his authority under 71 Pa.C.S. [sic] § 732–204[1], 73 Pa.C.S. [sic] § 210–4[2] and 73 Pa.C.S. [sic] § 201–8[3], and in *parens*

1. Section 204(c) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. § 732–204(c) provides, in pertinent part, that "[t]he Attorney General shall represent the Commonwealth ... in any action brought by or against the Commonwealth... The Attorney General shall collect, by suit or otherwise, all debts ... due the Commonwealth..."

2. Section 4 of the Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. § 201–4 provides, in pertinent part:

> Whenever the Attorney General ... has reason to believe that any person is using or is about to use any method, act or practice declared by section 3 of this act to be un-

lawful, and that proceedings would be in the public interest, he may bring an action in the name of the Commonwealth against such person to restrain by temporary or permanent injunction the use of such method, act or practice.

3. Section 8(b) of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–8(b) provides, in pertinent part:

> (b) In any action brought under section 4 of this act, if the court finds that a person, firm or corporation is wilfully using or has wilfully used a method, act or practice declared unlawful by section 3 of this act, the Attorney General ..., acting in the name of the Commonwealth of Pennsylvania, may

*patriae* [4] on behalf of the citizens of Pennsylvania, including its children and adolescents, to protect their health and welfare, and to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted action of the defendants, as well as injunctive relief. Complaint, p. 8. The Attorney General sought both monetary damages and injunctive relief flowing from various claims relating to the manufacturing, sale, distribution or promotion of tobacco products.

On November 23, 1998, forty-six states (including Pennsylvania), the District of Columbia, and five territories executed two agreements, the Master Settlement Agreement (MSA) and the Smokeless Tobacco Master Settlement Agreement (STMSA), to settle the lawsuits filed in these jurisdictions against the Defendants.[5] The MSA contains detailed formulas outlining the timing and amounts to be paid by the Defendants into an escrow account to then be distributed to each of the settling states, a total of $206,000,000,000.00 to be paid over twenty-five years.[6] Pennsylvania's share of the initial recovery under the MSA totals $11,260,000,000.00, with the potential for payments of over $500,000,-000.00 per year thereafter. This share of the monetary settlement comprises the third largest recovery among the settling states.[7] In addition, under the MSA the Defendants agreed to make concessions in the business practices, advertising and marketing of tobacco products.[8]

In exchange for this monetary settlement, each of the settling states agreed, *inter alia,* that the Defendants would be

recover, on behalf of the Commonwealth of Pennsylvania, a civil penalty of not exceeding one thousand dollars ($1,000) per violation, which civil penalty shall be in addition to other relief which may be granted under section[] 4 ... of this act...

4. " '*Parens patriae* ', literally 'parent of the country' refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability. It is a concept of standing utilized to protect those quasi-sovereign interests such as [the] health, comfort and welfare of the people, interstate water rights, [the] general economy of the state, etc." BLACK's LAW DICTIONARY 1003 (5 th ed.1979) (citations omitted).

5. Section II of the MSA defines "Releasing Parties" as:
[E]ach Settling State and any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commissions and divisions; and also means, to the full extent of the power of the signatories hereto to release past present and future claims, the following: (1) any Settling State's subdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions; and (2) persons or entities acting in parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or any other capacity, whether or not any of them participate in this settlement, (A) to the extent that any such person or entity is seeking relief on behalf of or generally applicable to the general public in such Settling State or the people of the State, as opposed solely to private or individual relief for separate and distinct injuries, or (B) to the extent that any such entity (as opposed to individual) is seeking recovery of health-care expenses (other than premium or capitation payments for the benefit of present or retired state employees) paid or reimbursed, directly or indirectly, by a Settling State.
MSA § II(pp).
In addition, section II of the MSA defines "Released Parties", in pertinent part, as:
[A]ll Participating Manufacturers, their past, present and future Affiliates, and the respective divisions, officers, directors, employees, representatives, insurers, lenders, underwriters, Tobacco–Related Organizations, trade associations, suppliers, agents, auditors, advertising agencies, public relations entities, attorneys, retailers and distributors of any Participating Manufacturer or of any such Affiliate (and the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing)...
MSA § II(*oo*).

6. *See* MSA § XI, Exhibits A, B, C, E.

7. *See* MSA Exhibit A.

8. *See* MSA §§ III, VI.

released from liability in the pending lawsuits and thereafter.[9] To this end, under the terms of the MSA, the settling states agreed to file consent decrees with the appropriate state courts in which the underlying lawsuits had been filed in order to settle those suits.[10]

9. In particular, section XII of the MSA provides, in pertinent part:

(a) *Release.*

(1) Upon the occurrence of State–Specific Finality in a Settling State, such Settling State shall absolutely and unconditionally release and forever discharge all Released Parties from all Released Claims that the Releasing Parties directly, indirectly, derivatively or in any other capacity ever had, now have, or hereafter can, shall or may have...

(3) Each Settling State (for itself and for the Releasing Parties) further covenants and agrees that it (and the Releasing Parties) shall not after the occurrence of State–Specific Finality sue or seek to establish civil liability against any Released Party based, in whole or in part, upon any of the Released Claims, and further agrees that such covenant and agreement shall be a complete defense to any such civil action or proceeding...

(b) *Released Claims Against Released Parties.* If a Releasing Party ... nonetheless attempts to maintain a Released Claim against a Released Party, such Released Party shall give written notice of such potential claim to the Attorney General of the applicable Settling State within 30 days of receiving notice of such potential claim (or within 30 days after the MSA Execution Date, whichever is later) (unless such potential claim is being maintained by such Settling State). The Released Party may offer the release and covenant as a complete defense. If it is determined at any point in such action that the release of such claim is unenforceable or invalid for any reason (including, but not limited to, lack of authority to release such claim), the following provisions shall apply:

(1) The Released Party shall take all ordinary and reasonable measures to defend the action fully. The Released Party may settle or enter into a stipulated judgment with respect to the action at any time in its sole discretion, but in such event, the offset described ... below shall apply only if the Released Party obtains the relevant Attorney General's consent to such settlement or stipulated judgment, without consent shall not be unreasonably withheld. The Released Party shall not be entitled to the offset described ... below if such Released Party failed to take ordinary and reasonable measures to defend the action fully.

(2) The following provisions shall apply where the Released Party is an Original Participating Manufacturer (or any person or entity that is a Released Party by virtue of its relationship with an Original Participating Manufacturer):

(A) In the event of a settlement or a stipulated judgment, the settlement or stipulated amount shall give rise to a continuing offset as such amount is actually paid against the full amount of such Original Participating Manufacturer's share ... of the applicable Settling State's Allocated Payment until such time as the settlement or stipulated amount is fully credited on a dollar-for-dollar basis.

(B) Judgments (other than a default judgment) against a Released Party in such an action shall, upon payment of such judgment, give rise to an immediate and continuing offset against the full amount of such Original Participating Manufacturer's share ... of the applicable Settling State's Allocated Payment, until such time as the judgment is fully credited on a dollar-for-dollar basis...

MSA § XII(a), (b).

10. Section XIII of the MSA provides, in pertinent part:

(a) Within 10 days after the MSA Execution Date ... each Settling State and each Participating Manufacturer that is a party in any of the lawsuits ... shall jointly move for a stay of all proceedings in such Settling State's lawsuit with respect to the Participating Manufacturers and all other Released Parties... Such stay of a Settling State's lawsuit shall be dissolved upon the earlier of the occurrence of State–Specific Finality or termination of this Agreement with respect to such Settling State...

(b) Not later than December 11, 1998...:

(1) each Settling State that is a party to a lawsuit ... and each Participating Manufacturer will:

(A) tender this Agreement to the Court in such Settling State for approval; and

(B) tender to the Court in such Settling State for entry of a consent decree attached hereto...; and

(2) each Settling State shall seek entry of an order of dismissal of claims dismissing with prejudice all claims against the Participating Manufacturers and any other Released Party in such Settling State's action... Provided, however, that the Settling

As a result, on December 11, 1998, the Commonwealth and the Defendants filed a joint motion in the trial court requesting approval of the settlement and the consent decrees. Before and after this joint motion was filed, a number of parties filed motions to intervene in the action. These parties included private anti-tobacco activists and organizations, not-for-profit hospitals, and the County of Allegheny (intervenors).

On January 13, 1999, the trial court issued four orders that are the basis of the instant appeals. On that date, the trial court issued orders: approving and entering the proposed agreed order of dismissal with prejudice submitted by the Commonwealth and the Defendants; approving and entering the consent decrees under the terms outlined in section XIII of the MSA and the STMSA; and denying the intervenors' petitions to intervene. The instant appeals were filed from these orders, and the appeals were consolidated and set for expedited review by this Court's order dated March 3, 1999.

However, on May 17, 1999 the County of Allegheny filed a praecipe to discontinue its appeals. This praecipe to discontinue is the basis of the above order of this Court discontinuing and ending the appeals with prejudice. I respectfully dissent with respect to the majority's order discontinuing the above-captioned appeals for two reasons.

The first basis for my dissent is my belief that the pleading filed in this court requesting discontinuance of the appeals does not comport with the relevant rules governing these types of pleadings, and does not demonstrate the good cause required for discontinuance. Pa.R.A.P. 1973(a) states, in pertinent part, that "[a]n appellant may discontinue an appeal or other matter as to all appellees as of course at any time prior to argument, *or*

*thereafter by leave of court upon application... "* (emphasis added). Thus, Rule 1973 only allows an appellant to discontinue an appeal after argument by leave of court upon application. *Marino v. Marino*, 411 Pa.Super. 424, 601 A.2d 1240 (1992); *Lowrey v. East Pikeland Township*, 143 Pa.Cmwlth. 440, 599 A.2d 271 (1991), *petition for allowance of appeal denied*, 530 Pa. 635, 606 A.2d 904 (1992). The application to discontinue must comply with the provisions of Pa.R.A.P. 123(a), stating with particularity the grounds on which it is based, and the grounds for the relief demanded by the application. *Id.* Failure to conform to the requirements for relief enunciated in Pa.R.A.P. 123(a) will result in the denial of the application. *Id.*

Based on the foregoing, it is clear that the praecipe to discontinue that was filed in this case was properly treated as an application to discontinue under Rule 1973(a). However, it is also clear that the instant application to discontinue does not comport with the requirements of Pa. R.A.P. No. 123(a) as required by *Lowrey.*

In addition, I believe that the instant application to discontinue should only be granted upon a showing of good cause for discontinuance. As the Superior Court has previously stated:

We must first address a procedural irregularity which arose at oral argument on this matter. Upon the conclusion of oral argument, [the Appellant] moved to withdraw this appeal... [The Appellant's] motion to withdraw has come too late and we decline to withdraw the case from appeal. [The Appellant] has allowed this case to proceed through extensive briefing, application of the machinery of this court and, finally, oral argument. It was only after oral argument that counsel presented this motion. We will not allow a litigant to avail himself of the full process of the

State is not required to seek entry of such an order in such Settling State's action against such a Released Party (other than a Participating Manufacturer) unless and un-

til such Released Party has released the Releasing Parties (and delivered to the Attorney General of such Settling State a copy of such release)...

court, and then permit that litigant to remove the case from the court's jurisdiction at the very last possible moment. Thus, we deny [the Appellant's motion] and will consider the appeal on the merits.

*Marino,* 601 A.2d at 1243. *See also, In re Fellman,* 412 Pa.Super. 577, 604 A.2d 263, 267–268, n. 3 (1992) ("After this opinion had been prepared, the parties advised the Court that terms of settlement had been agreed upon and requested leave to discontinue the appeal. Because of the lateness of the request, see: [*Marino*] and because of the significant policy issue involved . . . we declined to grant permission to discontinue the appeal.")

In this case, the application to discontinue does not demonstrate *any* cause, much less *good* cause, for discontinuing the instant appeals. In addition, because of the enormity of the settlement in this case [11], and the profound impact it will have on the substantive rights of the Commonwealth and its various constituents [12] and, ultimately, the citizens of this Commonwealth, these factors dictate that this Court give this matter our full attention and consideration. Based on all of the foregoing, I believe that the instant application to discontinue should be denied. *Fellman; Marino; Lowrey.*

The second basis for my dissent is my belief that the trial court erred in approving and entering the proposed agreed order of dismissal with prejudice submitted by the Commonwealth and the Defendants, and in approving and entering the consent decrees under the terms outlined in section XIII of the MSA and the STMSA.[13] As a result, I would reverse its order dismissing with prejudice the complaint filed by Attorney General Fisher on behalf of the Commonwealth of Pennsylvania, and its orders accepting and adopting the consent decrees.

It is true that there is a strong judicial policy in favor of parties voluntarily settling lawsuits. *Rothman v. Fillette,* 503 Pa. 259, 469 A.2d 543 (1983); *Schlosser v. Weiler,* 377 Pa. 582, 105 A.2d 331 (1954); *Health Care and Retirement Corp. v. Department of Public Welfare,* 159 Pa. Cmwlth. 8, 632 A.2d 964 (1993), *petition for allowance of appeal denied,* 538 Pa. 616, 645 A.2d 1319 (1994). In addition, settlement agreements have many of the attributes of contracts voluntarily undertaken, and must be construed according to traditional principles of contract construction. *Avery v. Pennsylvania Labor Relations Board,* 97 Pa.Cmwlth. 160, 509 A.2d 888 (1986). Therefore, for a settlement to be enforceable, like any other agreement, it must possess all of the elements of a valid contract, and it may be attacked for want of authority or consideration, or on the usual equitable grounds warranting that it be set aside. *Sale v. Ambler,* 335 Pa. 165, 6 A.2d 519 (1939); *Smith v. Brink,*

MSA § XIII(a), (b).

11. As noted above the settlement offered by the Defendants under the MSA totals $206,000,000,000.00 to be paid over a period of twenty-five years. Pennsylvania's share of the initial recovery totals $11,260,000,000.00, with the potential for payments of over $500,000,000.00 per year thereafter.

12. As also noted above, the provisions of the MSA purports to settle all past, present and future claims against the Defendants that could be asserted by the Commonwealth "[a]nd any of its past, present and future agents, officials acting in their official capacities, legal representatives, agencies, departments, commission and divisions..." MSA § II(pp). However, and more importantly,

the provisions of the MSA also purports to settle all past, present and future claims against the Defendants that could be asserted by the Commonwealth's "[s]ubdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions..." *Id.*

13. In its brief filed in support of the instant appeals, the County of Allegeny argues, *inter alia,* that the trial court erred in entering the consent decrees and final judgments which adopt the terms of the MSA. Therefore, it is appropriate to address the propriety of the trial court's actions in this regard in these appeals.

385 Pa.Super. 597, 561 A.2d 1253 (1989); *Baumgartner v. Whinney,* 156 Pa.Super. 167, 39 A.2d 738 (1944).

Likewise, a "consent decree" is an agreement between the parties to an equity action and is, in essence, a contract which is as binding as if a final decree had been rendered after a full hearing on the merits. *Weeast v. Borough of Wind Gap,* 153 Pa.Cmwlth. 330, 621 A.2d 1074 (1993). As was noted by the United States Supreme Court:

> To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts. More accurately, then, as we have previously recognized, consent decrees "have the attributes both of contracts and of judicial decrees"...

*Local Number 93 v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (citation omitted). Thus, in a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. *California State Automobile Association Inter–Insurance Bureau v. Superior Court,* 50 Cal.3d 658, 268 Cal.Rptr. 284, 788 P.2d 1156 (1990).

In addition, due to its contractual nature, a consent decree is not treated as a legal determination by the court of the matters in dispute. *Jones Memorial Baptist Church v. Brackeen,* 416 Pa. 599, 207 A.2d 861 (1965); *Universal Builders Supply, Inc. v. Shaler Highlands Corp.,* 405 Pa. 259, 175 A.2d 58 (1961); *Penn Town-ship v. Watts,* 152 Pa.Cmwlth. 359, 618 A.2d 1244 (1992); *Armstead v. Dandridge,* 257 Pa.Super. 415, 390 A.2d 1305 (1982). Rather, a consent decree is considered to be a contract that binds the parties to its terms. *Jones Memorial Baptist Church; Universal Builders Supply, Inc.; Penn Township.* Like a contract, even though a court may construe or interpret the provisions of a consent decree, a court may not modify its terms absent fraud, accident or mutual mistake. *Jones Memorial Baptist Church; Universal Builders Supply, Inc.; Penn Township.*[14] Thus, it is not for the court to pass on the workability or wisdom of the agreement underlying a consent decree. *Sacred Heart Hospital of Allentown v. Lanshe,* 445 Pa. 57, 282 A.2d 331 (1971).

However, the contractual nature of a consent decree does not affect the judicial character of a court's acceptance of the decree or its imposition of judgment thereon. Indeed, "[i]t is a judicial function and an exercise of the judicial power to render judgment on consent. A judgment upon consent is 'a judicial act'." *Pope v. United States,* 323 U.S. 1, 12, 65 S.Ct. 16, 89 L.Ed. 3 (1944) (citations omitted). Thus, as the California Supreme Court has noted:

> [A] stipulated judgment is indeed a judgment; entry thereof is a judicial act that a court has discretion to perform. Although a court may not add to or make a new stipulation without mutual consent of the parties, it may reject a stipulation that is contrary to public policy, or one that incorporates an erroneous rule of law. "While it is entirely proper for the court to accept stipulations of counsel that appear to have been

---

14. See also *Chernick v. Chernick,* 327 Md. 470, 610 A.2d 770 (1992) (Consent judgments or decrees are essentially agreements entered into by the parties which must be endorsed by the court; they have attributes of both contracts and judicial decrees.); *Coastal Production Credit Association v. Goodson Farms, Inc.,* 71 N.C.App. 421, 322 S.E.2d 398 (1984) (A consent judgment is a contract between the parties entered upon the record with the approval and sanction of the court.); *Nieminen v. Pitzer,* 281 Or. 53, 573 P.2d 1227 (1978) (A consent judgment is in the nature of a contract that has been approved by the court.); *Trahan v. Trahan,* 455 A.2d 1307 (R.I.1983) (Although a consent judgment receives a court's imprimatur, the judgment is in essence a contract between the parties to the litigation and is to be construed as a contract using the rules of construction applicable thereto.)

made advisedly, and after due consideration of the facts, the court cannot surrender its duty to see that the judgment to be entered is a just one, nor is the court to act as a mere puppet in the matter."

*California State Automobile Association Inter–Insurance Bureau,* 50 Cal.3d at 664, 268 Cal.Rptr. at 287, 788 P.2d at 1159 (citations omitted).[15]

Based on the foregoing, I strongly believe that it was incumbent upon the trial court in this case to make an independent examination of the proposed settlement and consent decrees, and to refuse to accept either unless it determined, among other considerations outlined below, that the "[j]udgment to be entered is a just one..." *Id.* Because I believe that the trial court misapprehended the nature of its review of the proposed settlement and consent decrees in this case, I am convinced that it erred in accepting the settlement and decrees and its orders should be reversed.

15.   *See also Everett v. Cutler Mills,* 52 R.I. 330, 160 A. 924 (1932) wherein the Rhode Island Supreme Court stated:

> A judgment is a decision of the law given by the court as the result of legal proceedings; it is not a contract between the parties. It is treated as a contract or as a quasi contract only by legal fiction for the purpose of enforcing legal remedies. The judgment in all substantial particulars must follow and conform to the verdict or the decision. An order for the entry of judgment is a judicial act, whether the entry is by consent or otherwise. It is the duty of the court to examine the record to ascertain its authority to enter a particular judgment. The stipulation is merely evidence to be considered by the court in making its decision to order the entry of judgment...

> *Id.* at 334, 160 A. at 925 (citations omitted); *State v. Huebner,* 230 Ind. 461, 468, 104 N.E.2d 385, 388 (1952) ("That the judgment was rendered by consent of the parties does not detract from its dignity, or lessen its conclusiveness as an adjudication between the parties, but the consent is a waiver of error precluding a review upon appeal.")

16.   Rule 229 of the Pennsylvania Rules of Civil Procedure states:

As the trial court noted in the opinion filed in support of its orders:

> The parties emphasize that they are not required by [Rule 229 of the Pennsylvania] Rules of Civil Procedure [16] to seek court approval and the entry of a consent decree in this case. However, the MSA requires certain uniform procedures in each settling state that will be facilitated by the entry of consent decrees creating "continuing jurisdiction in this Court to adjudicate any interpretation issues of enforcement that may arise as they apply to Pennsylvania."

Trial Opinion, p. 10 (footnotes omitted).

As this Court has previously noted, it is true that:

> [t]he Pennsylvania Rules of Civil Procedure ... do not provide general investigating power or require court approval for settlement agreements. *See* Pa. R.C.P. No. 229 (parties may settle and discontinue cases). [However, u]nder Pa.R.C.P. Nos. 2039(a) [17], 2206(a) [18],

> (a) A discontinuance shall be the exclusive method of voluntary termination of an action, in whole or in part, by the plaintiff before the commencement of trial.
> (b) A written discontinuance may not be entered as to less than all defendants except upon the written consent of all parties or leave of court after notice to all parties.
> (c) The court, upon petition and after notice, may strike off a discontinuance in order to protect the rights of any party from unreasonable inconvenience, vexation, harassment, expense or prejudice.
> Pa.R.Civ.P. No. 229.

17.   Rule 2039(a) of the Pennsylvania Rules of Civil Procedure states that "[n]o action to which a minor is a party shall be compromised, settled or discontinued except after approval by the court pursuant to a petition presented by the guardian of the minor." Pa. R.Civ.P. No.2039(a).

18.   Rule 2206(a) of the Pennsylvania Rules of Civil Procedure states:

> (a) No action for wrongful death in which a minor or an incapacitated person has an interest shall be discontinued nor shall the interest of a minor or an incapacitated person in any such action or in a judgment for damages recovered therein be

2064 [19], and [1714(a) [20]], the power of the parties to settle and discontinue cases is subject to court approval where the matter concerns a minor, an incompetent, or a class action.

*Department of Public Welfare v. Maplewood Manor Convalescent Center, Inc.,* 168 Pa.Cmwlth. 314, 650 A.2d 1117, 1119 (1994).

The purpose of Rule 1714 requiring court approval of a compromise, settlement, or discontinuance in a class action is to protect putative members of the class from prejudicial and binding action by the representative party. *Silver Spring Township v. Pennsy Supply, Inc.,* 149 Pa. Cmwlth. 314, 613 A.2d 108 (1992). Prior to approving a settlement in such a case, the trial court must conclude that it is fair and reasonable and adequately protects the members of the class. *Fischer v. Madway,* 336 Pa.Super. 289, 485 A.2d 809 (1984); *Buchanan v. Century Federal Savings and Loan Association,* 259 Pa.Super. 37, 393 A.2d 704 (1978). Although there is no formula for making such a determination, a court should consider: (1) the risks of establishing liability and damages; (2) the range of reasonableness of the settlement in light of the best possible recovery; (3) the range of reasonableness of the settlement in light of all the attendant risks of litigation; (4) the complexity, expense and likely duration of the litigation; (5) the stage of the proceedings and the amount of discovery completed; (6) the recommendations of competent counsel; and (7) the reaction of the class to the settlement. *Fischer; Buchanan.* In effect, prior to approving a settlement, the court should

conclude that it secures an adequate advantage for the class in return for the surrender of litigation rights. *Fischer; Buchanan.*

In addition, the purpose of Rule 2039 requiring court approval of a compromise, settlement, or discontinuance in an action in which a minor is a party is to protect the rights of minors in the settlement of their claims. *Wilson v. Bensalem Township School District,* 27 Pa.Cmwlth. 609, 367 A.2d 397 (1976). This Rule was promulgated to ensure that the interests of the minor are protected above all other conflicting interests, and to protect the minor's interests in all phases of litigation. *Estate of Murray v. Love,* 411 Pa.Super. 618, 602 A.2d 366 (1992); *Klein v. Cissone,* 297 Pa.Super. 207, 443 A.2d 799 (1982). Thus, this Rule was specifically designed to remove from the litigants and their counsel the authority to subjectively determine what is right for a minor, and makes the court the final arbiter of what is in the minor's best interests. *Power by Power v. Tomarchio,* 701 A.2d 1371 (Pa.Super.1997). Implicit in all of the foregoing cases, relating to the protection of the interests of minors in the settlement of cases, is the fact that the courts were acting as *parens patriae* for the minor. *See, e.g., Shaw by Ingram v. Bradley,* 448 Pa.Super. 506, 672 A.2d 331 (1996) (The court's decision awarding attorneys' fees, while acting as *parens patriae* or financial steward for the minor child pursuant to Pa.R.Civ.P. No.2039, will be reversed only upon a showing of an abuse of discretion or an error of law.) [21]

---

compromised or settled until the court, upon petition of any party in interest, shall allow the discontinuance or approve the compromise as being fair and equitable. Pa.R.Civ.P. No. 2206(a).

**19.** Rule 2064 of the Pennsylvania Rules of Civil Procedure states, in pertinent part, that "[n]o action to which an incapacitated person is a party shall be compromised, settled, or discontinued except after approval by the court pursuant to a petition presented by any party in interest." Pa.R.Civ.P. No.2064(a).

**20.** Rule 1714(a) of the Pennsylvania Rules of Civil Procedure states that "[n]o class action shall be compromised, settled or discontinued without the approval of the court after hearing." Pa.R.Civ.P. No. 1714(a).

**21.** Although there is a paucity of cases interpreting the provisions of Rule 2064 requiring court approval of a compromise, settlement, or discontinuance in an action in which an incompetent is a party, it would appear that it has the same purposes as Rule 2039 as "[t]his Rule is a virtually verbatim adoption for in-

As noted above, one of the bases for the Attorney General's initiation of the instant lawsuit was "[i]n *parens patriae* on behalf of the citizens of Pennsylvania, including its children and adolescents, to protect their health and welfare..." Complaint, p. 8. As the United States Supreme Court has noted:

> The concept of parens patriae is derived from the English constitutional system. As the system developed from its feudal beginnings, the King retained certain duties and powers, which were referred to as the "royal prerogative". These powers and duties were said to be exercised by the King in his capacity as "father of the country". Traditionally, the term was used to refer to the King's power as guardian of persons under legal disabilities to act for themselves. For example, Blackstone refers to the sovereign or his representative as "the general guardian of all infants, idiots, and lunatics", and as the superintendent of "all charitable uses in the kingdom". In the United States, the "royal prerogative" and the "parens patriae" function of the King passed to the States.
>
> The nature of the parens patriae suit has been greatly expanded in the United States beyond that which existed in England...

*Hawaii v. Standard Oil Company,* 405 U.S. 251, 257, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (citations and footnotes omitted).[22]

In fact, it has long been recognized that, under the *parens patriae* power, a state may initiate a lawsuit seeking injunctive or monetary relief where the claims are based on an alleged wrong to the general welfare of its citizenry. *See, e.g., Stead v. Fortner,* 255 Ill. 468, 478, 99 N.E. 680, 683–684 (1912) ("The public authorities have a right to institute the suit where the general public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety, and welfare is on a plane above mere pecuniary damage, although not susceptible to measurement in money, and to say that a court of equity may not enjoin a public nuisance because property rights are not involved would be to say that the state is unable to enforce the law or protect its citizens from public wrongs."); *State v. F.W. Fitch Co.,* 236 Iowa 208, 214, 17 N.W.2d 380, 383 (1945) ("It is a general rule that, independently of any statutory provision, a state may institute a suit in any of its own courts, whether required by its pecuniary interests or the general public welfare."); *State v. Ri–Mel, Inc.,* 417 N.W.2d 102, 112 (Minn.Ct.App.1987) ("[C]ommon law has recognized that under the doctrine of parens patriae a state may maintain a legal action on behalf of its citizens, where state citizens have been harmed and the state

---

competents of Rule 2039 applicable to minors." Goodrich–Amram 2d § 2064:2 (1992).

In addition, it is worth noting that the purpose of Rule 2206 requiring court approval of a compromise, settlement, or discontinuance in a wrongful death action in which a minor or an incompetent is a party is to ensure that a minor's interest is protected. *Estate of Murray.* Under the rule, a court may ensure that any settlement of a wrongful death action entered into for the benefit of a minor is fair and equitable. *Id.*

**22.** *See also Commonwealth v. Baldwin,* 1 Watts 54 (1832) wherein the Pennsylvania Supreme Court noted:

In a monarchy, the exemption of the sovereign from the operation of statutes in which he is not named, is founded in prerogative; and hence it is supposed that no

such exemption can be claimed, for a sovereign constituted of the people in their collective capacity. It is certain, that so much of the prerogative as appertained to the king by virtue of his dignity, is excluded by the nature of our government, which possesses none of the attributes of royalty; but so much of it as belonged to him in the capacity of *parens patriae,* or universal trustee, enters as much into our political compact, as it does into the principles of the British constitution. Why should it not do so peculiarly, where the maxim *salus populi* is the predominant principle of a government, to whose operations aud well being, the prerogative is as essential as to those of a monarchy?...

*Id.* at 55.

maintains a quasi-sovereign interest."); *State v. Kansas City Firefighters Local No. 42*, 672 S.W.2d 99, 126 (Mo.Ct.App. 1984) ("The right of a state, either as the sovereign or as a political corporation, to sue in any of its courts exists independent of statute... To enforce a right or redress a wrong as a political corporation, the state may have avail of any remedy open to a private suitor – as for instance a tort action for damage to its property."); *State v. Chicago & N.W. Ry. Co.*, 147 Neb. 970, 977, 25 N.W.2d 824, 828 (1947) ("It is a general rule that every government entrusted with powers and duties involving the public welfare has a right to apply to its own courts for any proper assistance in the exercise of one and discharge of another."); *People v. Gary M.*, 138 Misc.2d 1081, 1092, 526 N.Y.S.2d 986, 995 (1988) ("[T]he doctrine of parens patriae imposes an obligation on the part of the State to protect the rights of its citizens."); *State v. Hooker*, 87 N.W.2d 337, 340 (N.D.1957)

("It has been repeatedly held that the state has the right, independent of any statutory provision, to institute a suit in any of its courts when it is required for the general welfare of its people."); *State v. City of Bowling Green*, 38 Ohio St.2d 281, 283, 313 N.E.2d 409, 411 (1974) ("[W]here the state is deemed to be the trustee of property for the benefit of the public it has the obligation to bring suit not only to protect the corpus of the trust property but also to recoup the public's loss occasioned by the negligent acts of those who damage such property.")[23]

Based on the foregoing, it is clear that the Commonwealth properly initiated the instant lawsuit pursuant to the doctrine of *parens patriae*[24] as the complaint alleged, *inter alia*, that:

[i]t was filed on behalf of the citizens [of] Pennsylvania, including its children and adolescents, to protect their health and

**23.** See also In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), wherein the United States Supreme Court stated:

> [E]very government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it standing in court.

*Id.* at 584, 15 S.Ct. 900.

**24.** It is worth noting that the doctrine of parens patriae has arisen in another lawsuit filed against the Defendants in this case. Recently, a United States District Court denied the Defendants' motion to dismiss one of the three nationwide lawsuits brought by Blue Cross and Blue Shield medical providers against the Defendants for the recovery of economic damages incurred in the medical treatment of diseases caused by tobacco use. *See Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Incorporated*, 36 F.Supp.2d 560 (E.D.N.Y.1999). In that case, the plaintiffs alleged violations of the federal

Racketeer Influenced and Corrupt Organizations Act (RICO) and the Clayton and Sherman Antitrust Acts. *Id.* at 565. The plaintiffs also alleged state law claims under various statutes and under the common law on theories of fraudulent misrepresentation, fraudulent concealment, breach of special duty, unjust enrichment, and conspiracy. *Id.*

In the motion to dismiss, the Defendants alleged that the RICO claims should be dismissed, *inter alia*, because the plaintiffs lacked standing to bring the civil suit. *Id.* at 568–569. However, the trial court rejected this assertion stating, *inter alia*:

> Recognizing a direct cause of action on the part of the [plaintiffs] is consistent with the role plaintiffs play in today's society. In the same way that a spouse or parent has an obligation to provide for the medical injuries of his spouse or child, non-profit medical providers such as the [plaintiffs] have an obligation to supply medical care to their covered populations. More and more, medical providers such as the [plaintiffs] have assumed the responsibility for ensuring that individuals have access to medical care. For the nearly 70 million people, one out of four Americans, who rely on the [plaintiffs] to provide their medical care, plaintiffs occupy a type of parens patriae relationship which is analogous to the parent-child relationship.

*Id.* at 581.

welfare, and to recover damages which the Commonwealth and its citizens have sustained as a result of the unlawful and concerted action of the defendants, as well as injunctive relief.

Complaint, p. 8. In addition, relating to the settlement of the claims raised in the Attorney General's complaint, the provisions of the MSA purports to settle all past, present, and future claims that could be asserted against the Defendants by the Commonwealth and all of its "[s]ubdivisions (political or otherwise, including, but not limited to, municipalities, counties, parishes, villages, unincorporated districts and hospital districts), public entities, public instrumentalities and public educational institutions..." MSA §§ II(pp).

Thus, because this case was initiated, in part, as *parens patriae* for the protection of Pennsylvania's children and adolescents, and because the purported settlement extends to extinguish the potential claims that could be raised by a large class of unrepresented plaintiffs, it is my firm belief that the principles underlying Rules 1714, 2039 and 2064 of the Pennsylvania Rules of Civil procedure apply in this matter. Because the trial court's acceptance of the proposed settlement and consents decrees does not meet the mandates of these Rules, its orders accepting these decrees and entering judgment thereon should be reversed.

In the opinion filed in support of its orders in this case, the trial court stated the following, in pertinent part:

[I]n light of th[e] principles [relating to consent decrees], this Court approved the Consent Decrees that all the parties endorsed in their joint motion to approve the settlements and consent decree. This complicated settlement was reached after months of vigorous arms-length negotiations. It spares all parties incalculable expense and the uncertainties inherent in such complex litigation. The claims asserted by the Commonwealth's ten count complaint brought in its capacity as sovereign,

and as *parens patriae* on behalf of all of its citizens, were often novel and subtle. Resolution of such fundamental questions as whether subrogation is the exclusive statutory remedy for recouping the state's Medicaid expenditures was far from clear-cut as evidenced by conflicting precedent from other states. While other state courts in approving the MSA have noted the risks the Attorneys General faced with their cases, the tobacco defendants faced the formidable task of defending in 46 state actions raising complex issues that had to be fought out in a maze of varying state statutes and precedent.

Not only does the settlement spare the parties the expense and risks of continuing litigation, it accords with the strong judicial policy in Pennsylvania favoring voluntary settlements. For one thing, settlements assure more expeditious compensation for those who are injured since they avoid the inevitable delays of the appellate process. In addition, settlements help reduce overcrowded courts, thereby shortening a litigant's wait for a trial date. They also reduce the burdens and expenses in maintaining court systems. Not surprisingly, the Pennsylvania Supreme Court observed, the astute lawyer Abraham Lincoln advised: "Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser – in fees, expenses and waste of time."

[In conclusion, t]he attorneys general – in launching their landmark lawsuits against the tobacco industry – necessarily undertook the unpredictable financial risks borne by all litigants. The settlement agreements eliminate these risks – while affording undeniable benefits to the citizens of Pennsylvania. The MSA will thus provide billions of dollars to the Commonwealth to be dedicated to the public' good. The voluntary restraints that the tobacco defendants have accepted on their powers of persuasion – espe-

cially as directed to the youth of Pennsylvania – may also afford inestimable benefits. For these reasons, this court entered the Consent Decrees and approved the MSA and STMSA on January 13, 1999. To have done otherwise would have been a manifest abuse of discretion.

Trial Court Opinion, pp. 56–59 (citations and footnotes omitted).

It is true that, in considering whether to accept a settlement under Rule 1714, the trial court should consider, *inter alia*, the risks of establishing liability and damages, the complexity, expense and likely duration of litigation, and the recommendations of competent counsel. *Fischer; Buchanan.*[25] Likewise, in considering whether to accept a settlement under Rule 2039, the trial court should consider, *inter alia*, "[t]he concrete issues of 'causation' and 'proof'..." *Klein,* 443 A.2d at 799.

However, under Rule 1714, a trial court is also required to consider the range of reasonableness of the settlement in light of the best possible recovery. *Fischer; Buchanan.* In addition, under Rule 2039, the trial court is required to make the interests of the minor the paramount consideration over those of the parties to the litigation. *Power by Power; Klein.* Moreover, and more importantly, under either Rule 1714 or Rule 2039, the trial court must have before it sufficient necessary information to permit an intelligent decision prior to determining the appropriateness of a proposed settlement. *Fischer; Klein.*

It cannot be doubted that the amount of the settlement in this case, an initial recovery of 11.26 billion dollars over 25 years with the potential for future payments of over 500 million dollars annually thereafter, is a significant sum of money. However, the record in this case is absolutely devoid of *any* evidence establishing the damages suffered by the Commonwealth through its agencies, departments, commissions or divisions, *and* its 67 counties, *and* its various municipalities, cities, boroughs, townships, entities, instrumentalities and educational institutions. Thus, from this record, there is absolutely no way to determine the adequacy or appropriateness of the proposed settlement in this case. In the absence of *any* evidence to support this determination, the trial court was absolutely precluded from possessing the sufficient necessary information to permit an intelligent decision prior to accepting and endorsing settlement in this case.

In conclusion, it is clear to me that a trial court may not place its judicial imprimatur on a proposed settlement and consent decrees, and order the entry of judgment thereon, where the record utterly fails to demonstrate that it is a just and fair resolution to the matter. This is particularly so where the proposed settlement and consent decrees are of such a broad expanse, so absolutely preclude future claims and liability, and may never be altered or amended in any manner by the court. To my mind, the entry of judgment based on such a speculative and conjectural predicate affecting such significant rights must surely constitute an error of law. Accordingly, I would deny the application to discontinue the instant appeals, adjudicate these matters on the merits, and reverse the orders of the trial court in this case.

---

**25.** Indeed, "[i]n most cases, a very significant factor to be considered in determining whether a settlement is reasonable is the risk in proving liability and/or damages." *Fischer,* 485 A.2d at 812 *citing Buchanan.*